[No. A116834. First Dist., Div. One. Aug. 8, 2007.]

STATE ROUTE 4 BYPASS AUTHORITY, Petitioner, v.
THE SUPERIOR COURT OF CONTRA COSTA COUNTY, Respondent;
TOSHIKO MORIMOTO et al., Real Parties in Interest.

[No. A116851. First Dist., Div. One. Aug. 8, 2007.]

STATE ROUTE 4 BYPASS AUTHORITY, Petitioner, v.
THE SUPERIOR COURT OF CONTRA COSTA COUNTY, Respondent;
RONALD E. NUNN, Real Party in Interest.

COUNSEL

Greenan, Peffer, Sallander & Lally, Kevin D. Lally, John P. Makin, Angel L. Lewis; Silvano B. Marchesi, County Counsel, Sharon L. Anderson, Assistant County Counsel, and Beatrice Liu, Deputy County Counsel, for Petitioner.

No appearance for Respondent.

Bingham McCutchen and Matthew S. Gray for Real Parties in Interest.

OPINION

MARGULIES, J.—These consolidated writ petitions arise from two condemnation cases brought by the State Route 4 Bypass Authority (Bypass Authority), a joint powers agency empowered to acquire property for construction of a highway in East Contra Costa County. The superior court consolidated the two cases for purposes of a bifurcated trial on an issue material to the condemnation value of both properties: the constitutional validity of a right-of-way dedication requirement applicable to properties lying along the route of the planned highway. The trial court found the requirement to be unconstitutional, which will result in a higher valuation for the properties when the next phase of the condemnation trials is conducted. The Bypass Authority filed petitions for a writ of mandate overturning the trial court's decision as to both cases on the grounds that the trial court erred in finding the dedication requirement invalid.

Finding that writ relief is appropriate under the circumstances of these cases (see *City of Glendale v. Superior Court* (1993) 18 Cal.App.4th 1768,

1776 [23 Cal.Rptr.2d 305]), we stayed further proceedings on valuation, and issued an order to show cause why the relief prayed for in the petition should not be granted. We now hold that the Bypass Authority's position is meritorious, and will direct issuance of a peremptory writ.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Bypass Authority is a joint powers agency established in 1989 by Contra Costa County and the Cities of Brentwood and Antioch, pursuant to Government Code section 6500 et seq. The Bypass Authority was formed in part to facilitate construction of a new roadway in eastern Contra Costa County linking the State Route 4/160 interchange in the City of Antioch to Marsh Creek Road in the City of Brentwood (hereafter Bypass Project). For that purpose, the Bypass Authority is empowered to acquire real property through the exercise of eminent domain.

The precise alignment of the Bypass Project crosses two properties situated in the City of Antioch that are the subject of the petitions before this court—the Morimoto property (owned by Toshiko Morimoto, Nobuyoshi Morimoto, and Union Land Development), and the Nunn property (owned by Ronald E. Nunn). The petitions arise from separate condemnation actions filed by the Bypass Authority in Contra Costa Superior Court to acquire the Morimoto and Nunn properties: *State Route 4 Bypass Authority v. Morimoto*, 2005, No. C05-00485 (hereafter *Morimoto*) and *State Route 4 Bypass Authority v. Nunn*, 2005, No. C05-00857 (hereafter *Nunn*). The *Morimoto* and *Nunn* cases both involve a valuation issue that arises under what is known as the "*Porterville* doctrine," a name derived from the case of *City of Porterville v. Young* (1987) 195 Cal.App.3d 1260 [241 Cal.Rptr. 349] (*Porterville*).

### A. *The* Porterville *Issue*

 The *Porterville* case held that when a public agency conditioned the development of a property on a dedication of frontage to widen a public street, the portion subject to the dedication should be valued for condemnation purposes based on the existing use of the undeveloped property, not on its highest and best commercial use, as developed. (*Porterville, supra,* 195 Cal.App.3d at p. 1269.)[1] A later case restated the *Porterville* doctrine in the following terms: "When there is a reasonable probability that a public agency would require dedication of the take as a condition of development, the take

---

[1] The *Porterville* court explained the rationale for this rule as follows: "[I]f the take is so valued, and if the remainder of the parcel *is not* developed beyond its present agricultural use, owner will have been paid exactly what the take was worth; if the remainder of the parcel *is* developed for commercial purposes, owner will have been paid for the land he would have

should be valued based on the use that can be made of the property in its undeveloped state." (*Contra Costa County Flood Control etc. Dist. v. Lone Tree Investments* (1992) 7 Cal.App.4th 930, 937 [9 Cal.Rptr.2d 326].) Essential to the determination that a dedication condition is reasonably probable is a finding that such a requirement would be legally permissible: "[P]roof that a conditional dedication is a 'reasonable probability' requires a showing not only that plaintiff would probably have imposed the dedication condition if defendants had sought to develop the property, *but also* that the proposed dedication requirement would have been constitutionally permissible. . . . [I]t is not a 'reasonable probability' that a governmental entity would actually succeed in imposing an unconstitutional dedication requirement." (*City of Hollister v. McCullough* (1994) 26 Cal.App.4th 289, 297 [31 Cal.Rptr.2d 415] (*City of Hollister*).)

The *Porterville* issue arose as follows in the *Morimoto* case: The Bypass Authority seeks to acquire seven different components of the Morimoto property, including fee title to an approximately 16.94-acre parcel consisting of a strip of property some 250 feet wide lying across the centerline of the Bypass Project. The Bypass Authority adopted a policy requiring its member agencies, when granting development approvals to properties along or fronting the Bypass Project, to condition such approvals as follows: "The agencies shall require the dedication, as a part of any significant development entitlement, free and clear, of the 110 feet of right-of-way lying about the centerline of the SR4 Bypass. Significant development shall include but not be limited to the approval of tentative maps or change in land use." Relying on the *Porterville* doctrine, the Bypass Authority's appraiser concluded that a 4.69-acre portion of the 16.94-acre Morimoto parcel, consisting of a 110-foot-wide strip lying about the centerline of the Bypass Project,[2] should be valued based on its existing agricultural use, rather than at the higher valuation that would be applied to the remaining 12.25 acres of the parcel, based on the parcel's highest and best use as a commercial and residential development.

Similarly, the Nunn property includes an approximately 3.31-acre parcel, which the Bypass Authority seeks to acquire, consisting of a 250-foot-wide strip centered on the path of the Bypass Project. The Bypass Authority concluded that if Nunn were to propose development of this property, it is reasonably probable that the City of Antioch would require Nunn to dedicate a 110-foot-wide strip of his parcel (1.49 acres of the 3.31-acre parcel) under

---

been required to dedicate to city to obtain the building permits or conditional use permit necessary for the commercial development." (*Porterville, supra,* 195 Cal.App.3d at p. 1269, fn. omitted.)

[2] For reasons not explained in the record, the relative acreages of the 110-foot-wide and 250-foot-wide strips are not proportional to their widths. However, the parties stipulated to the acreages involved and the amounts are not material to the analysis.

the dedication policy described earlier. Using *Porterville*, the Bypass Authority's appraiser estimated the value of the 3.31-acre parcel by adding the undeveloped agricultural value of the 1.49-acre strip to a higher valuation of the other 1.82 acres of the parcel that is not subject to the dedication requirement, based on its potential future residential and commercial development.

## B. *The Bifurcated Trial*

Pursuant to the parties' stipulations in both condemnation cases, the trial court entered an order bifurcating trial of the *Porterville* issue from the subsequent trial on valuation, and coordinating the two cases solely for purposes of trial on the *Porterville* issue. The parties agreed that the trial would include the following issues: (1) whether the City of Antioch would require the defendants to dedicate a portion of the right-of-way for the Bypass Project as a condition of development of the subject properties to their highest and best uses; and (2) whether the required dedication would be lawful under California law, the California Constitution, and the federal Constitution.

Trial on the *Porterville* issue commenced on June 26, 2006. The Bypass Authority presented witnesses Dale Dennis, program manager for the Bypass Authority, Joseph Brandt, City Engineer and Director of Community Development for the City of Antioch, and Gerard Walters, a traffic engineer and traffic planner retained by the Bypass Authority. Morimoto and Nunn did not present any witnesses. The parties stipulated that (1) the Morimoto and Nunn properties were presently agricultural land subject to potential development, and (2) the highest and best use of the properties would be commercial and residential uses. The parties also stipulated to the amounts that each property would be worth depending on whether the Bypass Authority's dedication condition would or would not be applied to them in a developed state.

Dennis was employed as a program manager for both the Bypass Authority and a related joint powers agency, the East Contra Costa Regional Fee and Financing Authority (ECCRFFA). He testified and presented documentary evidence that the latter agency was formed to collect a transportation fee from developers to help finance regional transportation projects in eastern Contra Costa County, including the Bypass Project. Dennis also discussed the Bypass Authority's dedication policy. He testified that all member agencies had enforced the dedication requirement and that he knew of no development

along the bypass route where the dedication was not imposed. On cross-examination, Dennis acknowledged that the policy applied the same 110-foot dedication requirement to all developments on property located along the route of the bypass without regard to whether the development was commercial or residential, and without any determination of the added transportation load that the development might be expected to cause.

Brandt testified that the City of Antioch requires developers to dedicate and construct roads within new subdivisions, and to contribute at least one-half of the land and construction costs for roads adjoining developments. He stated that it was commonly understood in the development business that certain projects would cause more traffic than other developments. Brandt agreed that one of the purposes of Antioch's dedication requirements is to provide a way of handling the traffic generated by new developments. Regarding the Bypass Project, Brandt testified that it would mainly service regional traffic coming out of Brentwood, as well as some traffic from more distant locations, and some local traffic. On cross-examination, Brandt admitted that in applying the Bypass Authority's dedication requirement, he would not typically take into account any traffic study done in connection with a development or the nature of the development proposed. In fact, Brandt testified that he would recommend that Antioch apply a similar dedication requirement even if that were not the written policy of the Bypass Authority. He stated that he believed the Bypass Authority had done the necessary "nexus studies" to justify such a requirement, and that he would rely on what they had done.[3]

Walters testified that he was retained by the Bypass Authority to perform individualized nexus studies of the Nunn and Morimoto properties, comparing the traffic impacts attributable to the developments proposed for these properties with the cost to each property of meeting the dedication requirement and paying the ECCRFFA fees that would be imposed for such developments.[4] He concluded that the impacts of these developments on the transportation system would greatly outweigh the cost to the property owners of the dedication and fees combined. Using established traffic estimating

[3] Walters explained that a "nexus study" analyzes a development project's use of or impact on the transportation system in comparison to the financial burden of any responsibilities imposed on the project as conditions for its approval, including the payment of development fees. While ECCRFFA had done a nexus study in connection with its adoption of the development fee program, there was no evidence in the record that the Bypass Authority had done a nexus study before adopting the dedication policy.

[4] To translate traffic impacts into dollar figures, Walters determined the shares and dollar amounts of the total cost of the transportation capacity expansion projects funded under the ECCRFFA program that he calculated were attributable to the anticipated traffic impact of the Nunn and Morimoto developments. He used information supplied by the Bypass Authority's appraiser to determine the financial cost of the dedication requirement.

models, Walters calculated that the anticipated commercial and retail development of the Nunn property would result in an increased traffic load of 12,720 vehicle trips per day. The cost of the added transportation capacity necessary to accommodate this traffic was 15 times higher than the combined cost of the development fee and dedication that would be imposed if the development was approved. For the Morimoto property, Walters estimated that daily vehicle trips to the site would increase by approximately 5,000. He calculated that the added transportation construction cost attributable to development of the Morimoto property would be 1.9 or 1.4 times the combined cost to the owner of the development fee and dedication requirement, depending on the particular mix of retail, commercial, and residential units chosen as the highest and best use of the property.

Walters also testified that the properties reaped other, less quantifiable benefits due to their proximity to the Bypass Project. Since both properties were expected to include retail components, they would benefit from having more potential customers within convenient driving range. The bypass would also make the properties more visible to more drivers passing by them. Further, without the bypass, the developers of these sites would most likely have to incur added mitigation costs to address increased traffic on surrounding arterial streets.

C. *The Trial Court's Decision on the* Porterville *Issue*

The trial court entered a statement of decision on February 14, 2007. The court held that there was no dispute that the City of Antioch would have sought to require a dedication of a 110-foot area about the centerline of the Bypass alignment in connection with any development of the properties. However, for reasons discussed in greater detail *post*, the court held that such a requirement would not be constitutionally permissible under the United States Supreme Court's decision in *Dolan v. City of Tigard* (1994) 512 U.S. 374 [129 L.Ed.2d 304, 114 S.Ct. 2309] (*Dolan*). The trial court further found that the dedication requirement violated the equal protection clause of the United States Constitution. In essence, the court determined that the requirement imposed an unfair and unconstitutional burden on Nunn and Morimoto relative to other property owners who benefited from the Bypass Project, but whose property did not lie in its path.

D. *Proceedings in This Court*

With a trial on the remaining valuation issues in both cases scheduled to begin on May 7, 2007, the Bypass Authority filed a petition for writ of mandate and request for an immediate stay of the *Morimoto* action on February 22, 2007 (A116834), and a mandate petition and request for stay in

the *Nunn* case the next day (A116851). At this court's request, the Bypass Authority filed an amended petition in A116834 on March 1, 2007, correcting certain technical deficiencies in its original filings.

By order entered on April 4, 2007, this court (1) consolidated A116834 and A116851 for decision on the merits; (2) stayed trials in the *Morimoto* and *Nunn* cases pending a decision on the merits of the consolidated petitions; and (3) issued an order to show cause to the respondent court why the relief prayed for in the petition should not be granted.

## II. DISCUSSION

The central issue raised by the present petitions is whether the trial court was correct in holding that the Bypass Authority's dedication requirement was unconstitutional under the standards set forth in *Dolan*. In our view, the court misconstrued *Dolan* and judged the legality of the dedication requirement using a benchmark—equality of burden among all property owners benefiting from the Bypass Project—that is not required by *Dolan*, and not otherwise mandated by state or federal law.

A. *The* Dolan *Test*

■ We begin by considering the immediate legal context in which the *Dolan* case arose. The takings clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use without just compensation." (U.S. Const., 5th Amend.) The Fifth Amendment is incorporated into and made applicable to the states by the Fourteenth Amendment. (*Chicago, Burlington &c. R'd v. Chicago* (1897) 166 U.S. 226, 239 [41 L.Ed. 979, 17 S.Ct. 581].) ■ The California Constitution also requires the payment of just compensation when property is taken for public use. (See Cal. Const., art. I, § 19.)

■ There is no question under Fifth Amendment law that compelling a property owner outright to relinquish a portion of their land to public use constitutes an unlawful taking. (*Nollan v. California Coastal Comm'n* (1987) 483 U.S. 825, 831, 834 [97 L.Ed.2d 677, 107 S.Ct. 3141] (*Nollan*).) But the issue presented in *Dolan* and related cases is a more difficult one: Under what circumstances may a public agency require a dedication of property *as a condition* of granting a land use permit, without triggering the owner's right to just compensation?

The petitioners in *Nollan* sought a coastal development permit to build a three-bedroom house on their beachfront property. (*Nollan, supra,* 483 U.S. at p. 828.) The California Coastal Commission granted the permit on condition

that the petitioners allow the public an easement across their property to connect two public beaches located immediately to the north and south of the petitioners' property. (*Ibid.*) The commission made factual findings that the new house would increase blockage of the public's view of the ocean, thus contributing to " 'a "wall" of residential structures' " that would inhibit the public from becoming aware of the existence of this stretch of coastline, and, along with other private development in the area, would cumulatively burden the public's ability to enjoy the shorefront. (*Id.* at pp. 828–829.) The commission argued that it could therefore properly require the petitioners to offset that burden by providing lateral access to the public beaches in the form of an easement across their property. (*Id.* at p. 829.) The petitioners sought judicial redress, arguing that the access condition violated the takings clause. (483 U.S. at p. 829.)

The Supreme Court agreed. The majority assumed for purposes of analysis that the commission's stated purposes for imposing the access condition reflected legitimate governmental objectives that would enable it to deny outright the petitioners' permit to build if their new house would, either alone or cumulatively in combination with other construction, substantially impede their attainment. (*Nollan, supra,* 483 U.S. at pp. 835–836.) The court further agreed with the commission's argument that "a permit condition that serves the same legitimate police-power purpose as a refusal to issue the permit should not be found to be a taking if the refusal to issue the permit would not constitute a taking." (*Id.* at p. 836.) As the court reasoned, the agency's "assumed power to forbid construction of the house in order to protect the public's view of the beach must surely include the [less invasive] power to condition construction upon some concession by the owner, even a concession of property rights, that serves the same end." (*Ibid.*) Thus, a condition requiring the owner to provide a viewing spot on the property so that passersby could see the ocean would have been lawful. (*Ibid.*) But the fatal flaw in the commission's easement condition was that it did not, in fact, do anything to further the governmental purpose of protecting the public's view of the beach. (*Id.* at p. 838.) As the court pointed out, "[i]t is quite impossible to understand how a requirement that people already on the public beaches be able to walk across the [petitioners'] property reduces any obstacles to viewing the beach created by the new house." (*Ibid.*)

In the Supreme Court's formulation, the beach easement condition amounted to an uncompensated taking because it lacked an "essential nexus" to the governmental objective for which it was ostensibly imposed. (*Nollan, supra,* 483 U.S. at p. 837.) Absent that nexus, the government was leveraging an otherwise lawful method of regulating land use—the power to deny a building permit—into an improper seizure of property, without compensation, for purposes unrelated to the harms that justified imposition of the permit requirement in the first place. (*Ibid.*) Thus, regardless of the validity of the

objective served by the condition, the petitioners could not be compelled to contribute toward it, except by the exercise of eminent domain and payment of just compensation. (*Id.* at pp. 841–842.)

In *Dolan*, the Supreme Court took its analysis in *Nollan* one step further. The petitioner in *Dolan* applied to the city planning commission for a permit to replace the existing building housing her plumbing and electrical supply store with a larger one, and to expand the parking lot. (*Dolan, supra,* 512 U.S. at p. 379.) The commission approved the petitioner's permit application, but required her to dedicate one portion of the property (which was within a 100-year flood plain) for a public greenway that would improve storm drainage, and another strip adjacent to the greenway for a pedestrian and bicycle pathway. (*Id.* at p. 380.) The dedicated portions would have comprised about 10 percent of the petitioner's total property. (*Ibid.*) The commission made a series of findings concerning the relationship between the dedication conditions and the projected impacts of the petitioner's project: (1) it was " 'reasonable to assume' " that some future customers and employees of the store would use the pedestrian/bicycle pathway for their transportation and recreational needs, noting that the site plan included a bicycle rack in front of the proposed new building; (2) creation of a convenient, safe pedestrian/bicycle pathway system " 'could offset some of the traffic demand on [nearby] streets and lessen the increase in traffic congestion' "; and (3) increased storm water runoff from the site, caused by paving over a greater portion of the surface area for a parking lot, would add to the need for better management of the flood plain for drainage purposes. (*Id.* at pp. 381–382.)

The petitioner pursued administrative and judicial remedies, arguing that the city's dedication requirements were not related to the proposed development and therefore constituted an uncompensated taking of her property under the Fifth Amendment. (*Dolan, supra,* 512 U.S. at p. 382.) The Supreme Court began by addressing whether the city's permit conditions satisfied the *Nollan* "essential nexus" test. It first found that there was a sufficient logical nexus to satisfy *Nollan* between the legitimate governmental interest in reducing the risk of flooding and the greenway dedication condition, which was intended to improve storm drainage. (*Dolan,* at p. 387.) It found further that requiring dedication of a strip of the petitioner's land for a pedestrian/bicycle pathway was also sufficiently related to the objective of reducing traffic congestion to pass the *Nollan* test. (*Dolan,* at pp. 387–388.) But, as *Dolan* makes clear, the nexus standard merely defines a minimum threshold for determining the validity of a dedication requirement or condition. To avoid classification as a taking requiring the payment of just compensation under established Fifth Amendment jurisprudence, such a condition must also bear a reasonable relationship *in degree* to the projected impact of the proposed development. (*Dolan,* at p. 388.)

 The court surveyed prevailing state law "as to the necessary connection between the required dedication and the proposed development." (*Dolan, supra,* 512 U.S. at p. 389.) It noted that in some states, very generalized statements by the agency imposing a dedication condition were sufficient, whereas in other states the agency must demonstrate that its exaction is " 'specifically and uniquely attributable' " to a need created by the proposed development. (*Id.* at pp. 389–390, fn. 7.) The Supreme Court rejected the former standard as "too lax to adequately protect the petitioner's right to just compensation," but it also rejected the " 'specifi[c] and uniquely attributable' " test, stating that the federal Constitution does not require such "exacting scrutiny, given the nature of the interests involved." (*Dolan,* at pp. 389, 390.) Instead, the court expressed its approval of what it characterized as an intermediate standard, followed in a majority of the states. (*Id.* at pp. 390–391.) In those states, the agency must show that there is a " 'reasonable relationship' " between the dedication and the impact of the proposed development. (*Ibid.*) Rather than adopt this standard as such, the Supreme Court chose to reformulate it as follows: "We think a term such as 'rough proportionality' best encapsulates what we hold to be the requirement of the Fifth Amendment. No precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." (*Id.* at p. 391, fn. omitted.)

In applying this standard to the pedestrian/bicycle pathway condition imposed by the City of Tigard, the Supreme Court quoted from and enlarged upon the reasoning of a dissenting opinion filed earlier in the case by an Oregon Supreme Court justice: " '[T]he findings of fact that the bicycle pathway system "*could* offset some of the traffic demand" is a far cry from a finding that the bicycle pathway system *will,* or is *likely to,* offset some of the traffic demand.' [Citation.] No precise mathematical calculation is required, but the city must make some effort to quantify its findings in support of the dedication for the pedestrian/bicycle pathway beyond the conclusory statement that it could offset some of the traffic demand generated." (*Dolan, supra,* 512 U.S. at pp. 395–396.)

Regarding the greenway requirement, the *Dolan* court found the ostensible purpose of improving storm drainage could as readily be served by requiring a private greenway as by compelling the petitioner to dedicate land for a public greenway. (*Dolan, supra,* 512 U.S. at pp. 393–394.) It therefore held that the city's findings failed to show a reasonable relationship between the public greenway easement and the petitioner's proposed new development, noting that the analysis might turn out differently if the development would encroach on the city's existing public greenway space. (*Id.* at pp. 394–395.)

## B. *The Trial Court's Decision*

The trial court found that there was no dispute that the City of Antioch would require dedication of a full 110-foot-wide strip straddling the center-line of the bypass alignment as a condition for the development of both the Nunn and Morimoto properties. Thus, the first prong of the *Porterville* test was met: It was reasonably probable that if the owners had sought approval to develop their properties, the city would have conditioned such approval on the specified dedication. The salient disputed issue under the *Porterville* doctrine was whether applying such a condition to the hypothetical development of the properties would have been constitutionally permissible.

### 1. *Essential Nexus*

The statement of decision does not expressly address the *Nollan* standard, i.e., whether the dedication requirement would have advanced the same ostensible objective as a ban on development of the subject properties for their highest and best uses—the mitigation of traffic and transportation-related costs that such development would generate. However, real parties in interest concede that traffic control is a legitimate governmental purpose, and they did not cite or raise any issues under *Nollan* in their posttrial briefing. We therefore assume for purposes of our analysis that the dedication requirement satisfies the *Nollan* essential nexus standard.[5]

The principal disputed issues in the trial court were whether the dedication requirement satisfied the *Dolan* standard that it be based on (1) "some sort of individualized determination," and whether that determination, if made, showed that the exaction was (2) " 'rough[ly] proportiona[l]' " to the impact of the proposed development. (*Dolan, supra*, 512 U.S. at p. 391.)

### 2. *Individualized Determination*

It is important to recognize that the *Dolan* test had to be applied in this case to the purely hypothetical circumstance of a possible future development application for the properties in question. In a real development application process, there would be an opportunity for the issuing agency to make an assessment of the actual impacts of the development and to weigh them against the dedication requirement before imposing it. Here, the only opportunity for the agency to engage in that type of analysis was through the evidence it put on in the *Porterville* trial itself. Under these circumstances, the trial court properly deemed the evidence presented at the trial to, in fact, constitute the "individualized determination" required by *Dolan*.

---

[5] Real parties in interest do raise a *Nollan*-like issue based on *City of Hollister*. As discussed *post*, the *City of Hollister* case is distinguishable on its facts.

Real parties in interest maintain that (1) the court found that no individualized determination would have been performed by the City of Antioch prior to imposing the dedication condition, and (2) such finding was supported by uncontroverted evidence. We disagree on both counts.

Although the court found it to be undisputed that the City of Antioch "neither requested nor considered an individualized traffic analysis before imposing the dedication requirement," it also found—despite some ambiguity in the evidence—that the city maintained flexibility to make other concessions in the development approval process should it determine that the dedication requirement would impose an excessive burden in relation to a project's actual impacts.

In our view, the evidence shows only that the responsible officials were confident that the economic burden of complying with the dedication requirement was modest in relation to the cost of accommodating the likely traffic impact of any "significant development" to which it might apply. Such confidence was not in fact unjustified in light of available traffic impact data, including the impact costs calculated in connection with the ECCRFFA nexus study. It is true that the right-of-way dedication requirement was not designed to be raised or lowered according to the specific traffic impacts of each proposed development project. Nonetheless, there was no evidence that the Bypass Authority or the City of Antioch, if faced with a proposed development that would generate only an insubstantial amount of additional traffic, would have insisted on imposing the dedication policy without negotiation, modification, or offset. Witness Brandt, who had the last word on conditions of approval within the City of Antioch Planning Department, testified that he understood the city was required to operate under the *Dolan* decision, that he acted under the city attorney's close supervision, and that negotiating with developers over conditions was a commonplace part of his job.

Considering the fact that the trial court had to decide the "individualized determination" issue in the absence of any actual development application, its finding that this aspect of the *Dolan* standard was satisfied is supported by substantial evidence.

### 3. *Rough Proportionality*

In concluding that the dedication requirement did not meet the "rough proportionality" standard under *Dolan*, it was critical to the trial court that the ECCRFFA fees assessed to developers were set at a level below that required to cover the full traffic impact costs of the developments subject to them. We quote at some length from the statement of decision below in order to lay out the court's reasoning on this point.

Preliminarily, the court noted that although ECCRFFA had performed a nexus study to determine the level of transportation impact fees that would be attributable to new development, "[t]he fees ultimately assessed to the developers were (apparently for political considerations, to encourage development) less than the impact fees as determined by the study . . . ." The court then went on to link that apparently undisputed fact to the proportionality issue as follows: "[Witness Walters's] opinion was that the impacts to the transportation system outweighed the costs to [Nunn and Morimoto], taking into account both the developer fees under ECCRFFA and the loss of value of the take under *Porterville*. Without going into detail as to the facts testified to by Mr. Walters, this court finds the testimony credible. [¶] The crux of the Constitutional analysis, however, is not whether the financial burden of the dedication exceeds or is less than the developer's 'fair share' of traffic impacts. The inquiry must be whether, once the transportation impacts have been calculated, and a decision made to reduce those fees for *all* developers, whether some property owners, specifically those through which the Bypass will be constructed, must then be forced to shoulder a greater financial burden, not by virtue of increased traffic impacts, but solely by virtue of their location. This Court finds that under these facts, the dedication requirement cannot satisfy the standard set forth in *Dolan*."[6]

As discussed *post*, we do not find the trial court's approach to be required by or consistent with *Dolan*.

### 4. *Equal Protection Clause Violation*

The trial court also found that the dedication requirement, as it might have been hypothetically applied to the development of the Nunn and Morimoto properties, would have violated the equal protection clause. The court cited the following facts on this issue: The Nunn property is expected to contribute roughly two and one-half to three times as many vehicle trips per day to the bypass as the Morimoto property, yet the dedication requirement calls for less than one-third as much land from Nunn as from Morimoto. In addition, both Nunn and Morimoto are burdened with a dedication not borne by other developers whose developments will add vehicle trips to the bypass, but whose land does not lie in its path.

Based on these considerations, the court held as follows: "There is no rational basis for these differences in treatment, particularly given that this inequitable dedication burden could be eliminated by compensating Nunn and the Morimotos at the highest-and-best use value for the entire take and

---

[6] Elsewhere in the statement of decision, the trial court stated that it found Walters's testimony true, but irrelevant to the *Porterville* issue.

relying on the regional traffic fee established by the [ECCRFFA] to spread costs evenly among all expected to use the Bypass."

## C. *Does* Dolan *Require a Determination of Comparative Equity?*

In *Dolan*, the Supreme Court did not consider whether any property owners other than the petitioner were being required to dedicate land for a greenway or pedestrian/bicycle pathway. It focused solely on whether the dedication conditions in issue were reasonably related (or "roughly proportional") to the impacts of the petitioner's development plans on levels of storm water runoff and automobile traffic in the surrounding area. All that was constitutionally required of the city was that it perform "some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." (*Dolan, supra,* 512 U.S. at p. 391, fn. omitted.) In the case of the traffic issue, the court faulted the city for not making "some effort to quantify" its conclusory finding that the bicycle pathway system "could offset some of the traffic demand" caused by the petitioner's store expansion. (*Id.* at pp. 395–396.) None of these slightly different ways of phrasing the standard adopted in *Dolan* can reasonably be construed to mean that the City of Tigard was required to conduct a comparative analysis of the relative economic burdens it imposed on different property owners whose developments contributed to increased storm water runoff or traffic congestion in the downtown area.

In our view, the question of "whether the financial burden of the dedication exceeds or is less than the developer's 'fair share' of traffic impacts" is precisely "[t]he crux of the Constitutional analysis" required by *Dolan*. The trial court erred in holding that it was not, and therefore erred in holding that the Walters testimony, which it found credible, was nonetheless insufficient to establish that the Bypass Authority's dedication requirement was lawful under the takings clause as applied to the Nunn and Morimoto properties.

██ We also do not see why the imposition of ECCRFFA fees at levels that are less than required to cover the full traffic impact costs of new development should change the analysis under *Dolan*. At most, this fact shows that the Bypass Authority arguably could have chosen a more equitable means for distributing the financial burden of building the Bypass by greater reliance on developer fees. But the takings clause, as construed in *Dolan* and other cases, only protects a property owner from being assessed for more than the full spillover costs of developing his or her property; it does not compel public agencies to pick the most equitable possible method of distributing such costs. In fact, fairness in this context would seem to raise a host of complex public policy issues that are best resolved through the political

process rather than by judicial fiat.[7] There is certainly no evidence in this record establishing that raising the ECCRFFA fee structure across the board would itself be fair to all of the affected parties, much less that it represents a feasible alternative that would not bring development to a standstill in the member jurisdictions.[8]

The trial court's formulation of the *Dolan* test would also lead to a multitude of practical problems. There would first of all be problems of proof. Trying to establish that a developer challenging a dedication condition is not being asked to shoulder a greater financial burden than any other similarly situated developer would not be easy, and would likely become a fruitful source of litigation. More importantly, a standard like that proposed by the trial court would altogether discourage the use of dedication conditions as a tool for mitigating the spillover effects of development, and could provide an added disincentive for planning agencies to approve new development. One of the express purposes of the Bypass Authority's dedication policy was to protect the right-of-way for the Bypass Project pending construction. Presumably, many other transportation agencies around the state use similar dedication policies in order to facilitate the construction of significant projects. Absent compelling evidence of a constitutional infirmity, the use of that device should not be imperiled by the courts.

### D. Does the Dedication Policy Violate the Equal Protection Clause?

■ Under the equal protection clause, a state may not "deny to any person within its jurisdiction the equal protection of the laws." (U.S. Const., 14th Amend., § 1.) The clause "is essentially a direction that all persons similarly situated should be treated alike." (*Cleburne v. Cleburne Living Center, Inc.* (1985) 473 U.S. 432, 439 [87 L.Ed.2d 313, 105 S.Ct. 3249].) Generally speaking, laws that distinguish among different categories of

---

[7] For example: Are development fees the fairest method of financing the cost of public infrastructure, or should the costs be spread across other groups by greater utilization of broad-based taxes or bond financing? Are fuel taxes and toll roads a fairer method of financing transportation infrastructure than development fees? Do higher development fees unfairly impact the construction of affordable housing, hurting lower income and younger families especially? Do they hold back the growth of the local tax base and ultimately lead to reductions in services for existing residents or the need for even higher fees in the future? Do they put localities at a disadvantage in competing for desirable development?

[8] We note that the evidentiary record concerning the setting of these fees was truncated through no fault of the Bypass Authority. Real parties in interest's counsel objected on relevance grounds when the Bypass Authority sought to question witness Dennis about the gap between the fees and estimated impact costs, and the trial court sustained that objection, stating that "whether there's a shortfall or isn't a shortfall" was irrelevant to the fairness of asking only those with property in the right-of-way to dedicate land. To then decide the *Porterville* issue against petitioner in apparent reliance on that very factor seems questionable as a matter of procedural fairness.

persons, unless based on suspect classifications such as race or gender, are presumed to be valid and will be sustained as long as they are "rationally related to a legitimate state interest." (*Id.* at p. 440.) The Bypass Authority's dedication requirement in this case plainly involves no suspect classification, and is subject to the rational basis standard of review, as the trial court recognized. Such laws are normally upheld, since " 'the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.' " (*Lawrence v. Texas* (2003) 539 U.S. 558, 579–580 [156 L.Ed.2d 508, 123 S.Ct. 2472] (conc. opn. of O'Connor, J.), quoting *Cleburne*, at p. 440.)

In *Dolan*, the Supreme Court made a special point of distinguishing between the rational basis review and the new "rough proportionality" test that it was defining, observing that the former required only "the minimal level of scrutiny [required] under the Equal Protection Clause." (*Dolan, supra,* 512 U.S. at p. 391.) The clear implication of this discussion is that the court viewed rough proportionality as a more demanding standard than rational basis. In this case, it is undisputed that mitigating the traffic problems created by new development is a legitimate state interest. It was also either undisputed or proven by the evidence at trial that the dedication requirement facilitates the construction of new transportation capacity, that the requirement would have been imposed as a condition of allowing development of the properties subject to it, and that the financial burden of complying with the requirement is a fraction of the cost to the public of servicing the added vehicular traffic to be generated by that development. Together, these facts are more than sufficient to establish that the dedication program is rationally related to a legitimate governmental interest.

The trial court found no rational basis for imposing a greater burden on Morimoto than on Nunn, or for imposing a greater burden on properties lying on the bypass route than on other properties not in the path of the bypass path that would create equal or greater vehicular traffic if developed for commercial or residential use. In our view, the record in this case is wholly insufficient to draw any conclusions about the relative burdens placed on property owners to mitigate areawide transportation problems. Although other property owners might not be subject to the bypass dedication condition, they would be subject to other exactions and conditions. For example, Brandt testified that the City of Antioch generally requires developers to dedicate and pay for the construction of roads within their subdivisions, and to dedicate and/or pay for a portion of roads constructed along the edge of their property lines. Whether the full financial burden of complying with applicable development approval conditions is greater for real parties in interest than for the owners of properties lying outside the bypass route simply cannot be determined from the evidence in the record.

The case upon which real parties in interest principally rely, *Village of Willowbrook v. Olech* (2000) 528 U.S. 562 [145 L.Ed.2d 1060, 120 S.Ct. 1073] (*Willowbrook*), is distinguishable. *Willowbrook* involved the sufficiency of a complaint alleging that the village "intentionally demanded a 33-foot easement as a condition of connecting [the respondent's] property to the municipal water supply where [it] required only a 15-foot easement from other similarly situated property owners. [Citation.] [The 33-foot easement demand] was 'irrational and wholly arbitrary[,]' and . . . the [v]illage ultimately connected [the respondent's] property after receiving a clearly adequate 15-foot easement." (*Id.* at p. 565.) The Supreme Court held that these allegations were sufficient to state a claim for relief under the equal protection clause. (*Willowbrook*, at p. 565.)

The critical factor in *Willowbrook* was that the allegations, if true, would have established that the longer easement was not rationally related to any legitimate governmental interest. Here, all property owners along the path of the bypass were subject to the same requirement to dedicate a strip of property 110 feet wide along the centerline of the route. The requirement was rationally related to protecting the right-of-way chosen through democratic processes for a central component of the Bypass Authority's transportation plan for East Contra Costa County. Moreover, as Walters's testimony established, properties lying along the bypass route gain economic benefits from their proximity to it that also may rationally justify imposition of a dedication requirement to recoup some of those benefits for the public. In fact, as the Bypass Authority points out, Walters's testimony established that the Nunn and Morimoto properties will effectively receive a subsidy from construction of the bypass and other projects because of the sizeable gap between the full public cost of accommodating their added vehicular traffic and the private cost of the dedication requirement and development fees to which they will be subject. That the dedication requirement will arguably lower the subsidy real parties in interest will enjoy compared to that received by other property owners, or that Nunn is garnering a greater subsidy than Morimoto, does not raise equal protection issues.

■ Although the trial court, and real parties in interest, take the position that it would be fairer and more rational to do away with the dedication requirement and raise ECCRFFA fee levels for all developers, the equal protection clause is not a rule of thumb for determining the relative fairness and wisdom of different public policy choices. It is a safeguard against wholly irrational policies that do not advance a legitimate state interest or that single out an unpopular group for discriminatory treatment. The court erred in holding that applying the dedication requirement to the Nunn and Morimoto properties would have been impermissible under an equal protection analysis.

E. *The* City of Hollister *Case*

Under the heading "Conclusion," the final paragraph of the trial court's statement of decision reads as follows: "The Bypass is a long-planned improvement to the State highway system designed to address existing deficiencies. Once constructed, the Bypass will become a State highway [replacing] State Route 4, which will become a city street. Requiring dedications from [real parties in interest] to accommodate the long-planned replacement of an existing segment of [the] State highway impermissibly shifts the burden of providing a public benefit to a few landowners who are only remotely responsible for the need for it. *City of Hollister, supra*[,] 26 Cal.App.4th at [pages] 299–300. For these reasons, the Court finds in favor of Defendants and against Plaintiff on this bifurcated issue."

The heading, placement, and wording of the above quoted paragraph all suggest that the trial court intended it as a final summation of the earlier stated legal grounds for its decision. Real parties in interest nonetheless assume that the trial court was stating a separate and independent legal basis for its decision in the paragraph. Although there is some ambiguity about it, we will assume for purposes of our analysis that real parties in interest are correct on this point.

As an initial matter, we note that *City of Hollister* was decided before the Supreme Court issued its opinion in *Dolan*. It is at least arguable whether *City of Hollister* has any continuing precedential value on the issues before us in light of the latter case. The standard it applied was whether the dedication requirement in issue, which was for construction of a roadway, "was reasonably related to defendants' proposed use of the property." (*City of Hollister, supra*, 26 Cal.App.4th at p. 298.) As real parties in interest concede, *Dolan* requires a more stringent standard of review for dedication conditions than that applied by the Court of Appeal in *City of Hollister*.

In any event, *City of Hollister* is distinguishable on its facts. The defendant property owners in that case put in evidence that the construction of the roadway was not merited by the proposed development of their property. (*City of Hollister, supra*, 26 Cal.App.4th at pp. 298–299.) Undisputed evidence established that the actual traffic impact of the defendants' proposed development would be " 'very insignificant,' " and that the city wanted the dedication to construct a road called for by a planning map the city had adopted 20 years earlier for purposes unrelated to the development of the defendants' property. (*Id.* at p. 299.) As the Court of Appeal explained: "The fact that this map was adopted long before there was any proposed development of defendants' parcel or any positive steps taken to acquire the property by eminent domain further indicates that plaintiff's proposed use of a portion of defendants'

parcel for street . . . purposes was unrelated to defendants' potential development of their parcel." (*Id.* at p. 300.) Thus, the dedication condition in *City of Hollister* was found to be unlawful because the evidence showed that the city's actual reason for imposing it was unrelated to mitigating the impact of the defendants' proposed use of the property. In practical effect, *City of Hollister* applied the *Nollan* essential nexus test, albeit in a slightly different guise.

Whatever label is given to its analysis, the facts in *City of Hollister* are the diametric opposite of those before us. It was critical to the Court of Appeal in *City of Hollister* that the development of the subject property would contribute only a " 'very insignificant' " amount of traffic to the roadway. Here, by contrast, there is credible and uncontested evidence that the Nunn and Morimoto properties will each contribute a substantial amount of daily vehicular traffic to the bypass once they are developed. Not only is that additional traffic significant on an absolute scale, the evidence shows that it is also significant in comparison to the economic burden of the dedication requirement on both properties.

It is true that the bypass was planned in advance of any specific development approval sought for the subject properties, and that the project will serve many properties other than the Nunn and Morimoto parcels, both in Antioch and in East Contra Costa County generally, including already developed properties. But *City of Hollister* does not stand for the proposition—which was in any event decisively rejected in *Dolan*—that a dedication requirement must be " 'specifi[cally] and uniquely attributable' " to the development against which it is applied. (*Dolan, supra,* 512 U.S. at pp. 389–390.) Here, as the ECCRFFA nexus study and the testimony of traffic planner Walters made clear, the project was designed to meet the needs of new as well as existing development in the member jurisdictions, and the hypothetical development of the Nunn and Morimoto properties will contribute not insignificantly to those needs. Under *City of Hollister*, no more was required to justify the dedication requirement.

## III. CONCLUSION AND DISPOSITION

For these reasons, we hold that the trial court erred in finding that the dedication requirement was unlawful and in resolving the *Porterville* issue in favor of real parties in interest.

Let a peremptory writ of mandate issue, commanding the Contra Costa County Superior Court in cases Nos. C05-00485 and C05-00857 to vacate the statement of decision filed on February 14, 2007, and to instead enter a statement of decision ruling in favor of the Bypass Authority in accordance with the views expressed in this opinion. The stay previously imposed shall remain in effect until the remittitur issues.

Marchiano, P. J., and Swager, J., concurred.

A petition for a rehearing was denied September 5, 2007, and the petition of real parties in interest for review by the Supreme Court was denied November 14, 2007, S156389.