Filed 8/9/13

CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| CITY OF PERRIS, | |
| Plaintiff and Respondent, | E053395 |
| v. | (Super.Ct.No. RIC524291) |
| RICHARD C. STAMPER et al., | O P I N I O N |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Dallas Holmes, Judge. (Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Reversed with directions.

Allen Matkins Leck Gamble Mallory & Natsis and K. Erik Friess for Defendants and Appellants.

Aleshire & Wynder, Eric L. Dunn, Sanaz K. Soltani, and Pam K. Lee for Plaintiff and Respondent.

# I. INTRODUCTION

Defendants and appellants, Richard C. Stamper, Donald D. Robinson, and Donald Dean Robinson, LLC (the owners), own a 9.1-acre parcel of land in Perris, California. The parcel (the Stamper Property) is vacant land zoned for light industrial use. In 2005, plaintiff and respondent, City of Perris (the City), designated certain truck routes in an amended circulation element of its general plan. To establish one such truck route, a section of Indian Avenue would need to be realigned and, as a result, pass through the Stamper Property. As shown in the circulation plan, Indian Avenue would be 94 feet in width comprising about 19 percent of the 9.2-acre parcel. In 2009, the City filed the underlying eminent domain action to acquire the portion of the Stamper Property needed for the Indian Avenue truck route project (the take).

The City appraised the take as undevelopable agricultural land. The City based this appraisal on the theory that it would not approve of any development plan for the Stamper Property unless the owners gave—or dedicated—the take to the City. Because of this dedication requirement, the City argued, the take would either be given to the City as a condition of development or remain vacant and usable only for growing crops, and as such should be valued on that basis. The owners argued that the dedication requirement should not be considered in determining the fair market value of the property because it was not reasonably probable the City would impose the dedication requirement and, if imposed, it would be unconstitutional. Because the dedication requirement should not be

considered, the owners argued, the take should be valued at its highest and best use as light industrial property, the present zoning classification.

The court granted the City's request to bifurcate the trial. In the first phase, the court would decide the "legal issues"; in the second phase, a jury would determine valuation. At the conclusion of the first phase, the court determined that the dedication requirement was reasonably probable and was constitutional. After these issues were decided in the City's favor, the owners stipulated to the City's appraisal, and the court entered judgment based thereon.

On appeal, the owners challenge the court's substantive rulings in the first phase of the trial as well as the decision to have the court, not the jury, determine issues concerning the dedication requirement. They also challenge certain evidentiary rulings and the court's ruling allowing the City to withdraw a statutorily required deposit.

We hold that the issues surrounding the dedication requirement are essential to the determination of "just compensation" and therefore must be "ascertained by a jury." (See Cal. Const., art. I, § 19(a).) Accordingly, we will reverse the judgment.

## II. BACKGROUND

The Stamper Property is a 9.1-acre roughly square-shaped parcel of land located on the southwest corner of Perry Street and Barrett Avenue in the City of Perris. Perry Street and Barrett Avenue are both 60 feet wide and unpaved. Perry Street runs east-west, parallel to, and north of the Ramona Expressway, a major thoroughfare. Barrett Avenue runs north-south and intersects the Ramona Expressway south of the Stamper

3

Property.  The Stamper Property is vacant and is used for agricultural purposes, but is zoned for light industrial uses.  No proposal to develop the Stamper Property was pending at the time of trial.[1]

Before 1999, the City planned another street, Indian Avenue, to run in a straight line, north and south of and intersecting the Ramona Expressway.  The Stamper Property lies some distance to the east of this pre-1999 alignment of Indian Avenue.

In the mid or late 1990's, Lowe's, a home improvement retail business, proposed to build a distribution center in the City.  As part of its development application, Lowe's asked the City to amend the circulation element of its general plan to realign Indian Avenue south of the Ramona Expressway in order to make room for its distribution center.  The City agreed, and in November 1999 it realigned a half-mile segment of Indian Avenue, south of the Ramona Expressway, as part of an amended circulation element of the City's general plan.  From a point south of the Ramona Expressway, Indian Avenue was to curve northeasterly and meet the Ramona Expressway where Barrett Avenue meets the Ramona Expressway from the north.  As realigned in 1999, Indian Avenue would not intersect the Stamper Property.

In June 2005, the City adopted a new circulation element to its general plan.  The new circulation element states:  "The efficient movement of goods in and through the City of Perris is vital to the City and the Inland Empire's economy and improves traveler

---

[1] According to the City, a prior owner of the Stamper Property dedicated the land for Perry Street and Barrett Avenue.

4

safety.  The ability of the County to compete domestically and internationally on an economic basis requires an efficient and cost-effective method for distributing and receiving products."  To address these concerns, the circulation element discusses the need to designate truck routes in the northern area of the City:  "As healthy industrial growth is expected within the City, related truck traffic will continue to increase particularly in northern Perris.  In addition, similar growth just north of Perris in Moreno Valley will exacerbate traffic conditions . . . . The designated truck routes are intended to indicate arterial streets, which may be used for truck movement in excess of the weight designated in the City Ordinance for movement through the City."

As part of the June 2005 circulation element, the City designated Indian Avenue as a four-lane "secondary arterial truck route" and realigned Indian Avenue north of the Ramona Expressway.  In its new configuration, Indian Avenue proceeds northward from the Ramona Expressway, curves northwesterly through the Stamper Property, and eventually connects to the preexisting northern segment of Indian Avenue.  Indian Avenue will cut a curving, roughly diagonal 94-foot-wide swath through the Stamper Property, dividing it into two irregularly-shaped parcels, approximately 5.5 acres and 2.0 acres in size, one on either side of Indian Avenue.  The size of the 94-foot-wide swath through the Stamper Property (the take) is 1.66 acres.[2]

---

[2]  To implement the circulation element, the City established the North Perris Road and Bridge Benefit District (NPRBBD) in 2008.  The Stamper Property is within the boundary of the NPRBBD.  The purpose of the NPRBBD is to provide a mechanism for financing numerous road and bridge improvements indicated in the circulation element, including the realigned and expanded Indian Avenue.  The costs of

*[footnote continued on next page]*

5

In October 2008, the City offered to buy the take from the owners for $54,400, and increased its offer to $54,800 in January 2009. The City's offers valued the take as if it were limited to agricultural use, although the Stamper Property (including the take) was zoned for light industrial use. According to the City, the take should not have been appraised as developable industrial property because the City could and would require the owners to dedicate the take to the City as a condition of any industrial development.

In March 2009, the City adopted a resolution of necessity authorizing acquisition of the take through eminent domain. The express purpose of the resolution was "to carry out and make effective the principal purpose of the Project," which is defined as "Indian Avenue right-of-way improvements." The City's eminent domain action followed. Thereafter, the City deposited $54,800 with the court as "the probable amount of the compensation" payable to the owners for the take. (Code Civ. Proc., § 1255.010.)[3] The owners moved to increase the deposit on the ground the City's claimed dedication requirement was unconstitutional and the take should be valued as industrial property, its

---

*[footnote continued from previous page]*
improvements financed by the NPRBBD will ultimately be paid by fees assessed against property owners upon the subdivision or development of their properties. The amount of each owner's fee is a function of the size of the property or number of dwelling units and the nature of the development. According to one report submitted by the City, "[t]he payment of the NPRBBD fee is not intended to relieve the subdivider, developer or an applicant for a building permit from the requirements imposed under other provisions or Ordinances of the City of Perris to dedicate and improve roads as a condition of approval of a tentative map or building permit."

[3] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

current zoning classification and its highest and best use. The court granted the motion and ordered the City to increase its deposit to $511,602. The City complied.

Thereafter, the matter proceeded to the trial on compensation. As indicated, the court bifurcated the trial and ruled on certain issues it deemed "legal issue[s] affecting the determination of compensation" before a jury was to determine the owners' compensation. (§ 1260.040.)

Before we discuss the trial court's rulings and analyze the parties' claims, we review the legal principles governing compensation in eminent domain and the extant case law concerning the effect of dedication requirements on the value of property taken in eminent domain.

## III. LEGAL PRINCIPLES/OVERVIEW

A. *Just Compensation and Permissible Dedication Requirements*

Private property shall not be taken for public use without just compensation. (U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, § 19.) "Such compensation means the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken." (*United States v. Miller* (1943) 317 U.S. 369, 373, fns. omitted; see also *Mt. San Jacinto Community College Dist. v. Superior Court* (2007) 40 Cal.4th 648, 653.) Compensation is to be based on the loss to the owner, not the benefit received by the condemner. (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 866.)

7

Under California's eminent domain law, the measure of compensation is the fair market value of the property. (§ 1263.310; *Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.* (1997) 16 Cal.4th 694, 698.) Fair market value is statutorily defined in section 1263.320, subdivision (a), as "the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available."

Governments may, of course, restrict the "uses and purposes" of private property without triggering the requirement of paying compensation. "[T]he authority of state and local governments to engage in land use planning has been sustained against constitutional challenge as long ago as [the] decision in *Village of Euclid v. Ambler Realty Co.* [(1926)] 272 U.S. 365 . . . . 'Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.' [Citation.]" (*Dolan v. City of Tigard* (1994) 512 U.S. 374, 384-385 (*Dolan*); see also *Ayres v. City Council of Los Angeles* (1949) 34 Cal.2d 31, 37-43 [dedication conditions are reasonable restrictions that do not constitute a taking].)

Property which use is known to be restricted will generally be valued less than property not so restricted. (See 1 Matteoni & Veit, Condemnation Practice in Cal. (Cont.Ed.Bar 3d ed. 2011) § 4.12, pp. 123-128.) As such, zoning restrictions on the use

of property can affect the availability of the property for some purposes and thereby depress its fair market value. (See *Long Beach City H.S. Dist. v. Stewart* (1947) 30 Cal.2d 763, 766; *People ex rel. Dept. Pub. Wks. v. Arthofer* (1966) 245 Cal.App.2d 454, 467 [Fourth Dist., Div. Two].) Similarly, the condemner's use of dedication requirements as conditions of development will likewise restrict the use of the property and affect the property's fair market value. (See *City of Fresno v. Cloud* (1972) 26 Cal.App.3d 113, 123 (*Fresno*); *City of Porterville v. Young* (1987) 195 Cal.App.3d 1260, 1269 (*Porterville*); *City of Hollister v. McCullough* (1994) 26 Cal.App.4th 289, 296 (*Hollister*).)

B. *The Fresno/Porterville Doctrine*

In *Fresno*, the City of Fresno condemned 40-foot strips of land fronting two 10-acre parcels in order to widen two city streets in accordance with the city's master plan. (*Fresno, supra,* 26 Cal.App.3d at pp. 115-116.) The parcels were zoned for residential and agricultural uses. (*Id*. at p. 115.) The city claimed that if development of any property required a zoning change and could generate increased volumes of traffic, then the city could require the property owners to make street dedications necessary to widen the affected streets in accordance with the master plan, as a condition of approving the zoning change and of issuing building permits. (*Id*. at pp. 115, 117, fn. 5.)

The owners waived severance damages and trial proceeded on the value of the 40-acre strips. (*Fresno, supra,* 26 Cal.App.3d at p. 116.) The owners' appraiser valued the 40-foot strips based on his opinion there was a "reasonable probability" the parcels would

9

be rezoned to more favorable uses in the near future, including multiple-unit residential. (*Ibid.*)  The city's appraiser valued the strips based on their current zoning (residential-agricultural), based on his assumption that the strips could never be used for any purpose given that the city would require their dedication for street widening purposes in the event of a more favorable zoning change.  (*Id.* at p. 117.)

The court did not allow the city to present evidence of the dedication requirements.  (*Fresno, supra,* 26 Cal.App.3d at p. 119.)  The Court of Appeal held this was error.  It explained:  "[I]f upon retrial of the valuation issue, the court finds that the strips taken from [the parcels] are a part of the very frontage that the landowners would have had to dedicate to the city in order to secure the zoning changes needed to develop the remaining parcels to their highest and best uses, the court must not value the property taken on the basis of those highest and best uses; it must determine instead the value of the frontage strips taken on the basis of the highest and best uses permitted by the existing zoning, because this land could never be used for any other purpose."  (*Id.* at p. 123.)

*Fresno* was followed in *Porterville, supra,* 195 Cal.App.3d 1260.  The defendant owned five acres abutting Prospect Street in Porterville.  The parcel was zoned for commercial use and planned unit development.  (*Id.* at pp. 1262-1263.)  The City of Porterville condemned a 12-foot-wide strip of the parcel to widen Prospect Street as indicated in the city's general plan.  (*Id.* at p. 1263 & fn. 3.)  The city argued that, under *Fresno*, the frontage strip should be valued as agricultural land.  (*Porterville, supra,* at p.

10

1265.) The appellate court agreed. It explained: "Although the parcel was zoned for commercial purposes, it could not be adapted and developed for such purposes without a dedication of frontage to widen the east side of Prospect Street to its ultimate planned width of 42 feet—half of the total planned width of 84 feet. The take is the very frontage owner would have had to dedicate to city to secure the building permits or conditional use permit needed to develop the parcel to its highest and best commercial use. The trial court should have determined the value of the take on the basis of its agricultural use, because it could never be used for any other purpose. To paraphrase [*Fresno*]: if the take is so valued, and if the remainder of the parcel *is not* developed beyond its present agricultural use, owner will have been paid exactly what the take was worth; if the remainder of the parcel *is* developed for commercial purposes, owner will have been paid for the land he would have been required to dedicate to city to obtain the building permits or conditional use permit necessary for the commercial development." (*Id*. at p. 1269, fn. omitted.)

*Fresno* and *Porterville* stand for the proposition that when condemned property would have to be dedicated as a condition of developing the larger parcel of which the condemned property is a part, the condemned property must be valued at its current use because it could never be used for any other purpose. Neither *Fresno* nor *Porterville* addressed whether the condemners' claimed street dedication requirements could be constitutionally imposed as conditions of development, however.

11

*Contra Costa County Flood Control etc. Dist. v. Lone Tree Investments* (1992) 7 Cal.App.4th 930 (*Lone Tree*), involved the taking of a portion of the defendant's land for a "major flood control project." (*Id*. at pp. 931-932.) The condemning flood control district argued that any development of the defendant's property would be conditioned on dedication of the take and should therefore be valued based on agricultural use. (*Id*. at p. 932.) Relying heavily on *Fresno* and *Porterville*, the Court of Appeal agreed: "When there is a reasonable probability that a public agency would require dedication of the take as a condition of development, the take should be valued based on the use that can be made of the property in its undeveloped state." (*Lone Tree, supra,* at p. 937.) Like *Fresno* and *Porterville*, *Lone Tree* did not address whether the claimed dedication requirement for the flood control project could be constitutionally imposed on the owners of the condemned property.

*Lone Tree* was followed by *Hollister, supra,* 26 Cal.App.4th 289, which, like *Fresno* and *Porterville*, involved a city seeking to condemn a portion of the defendants' property for purposes of a street. The condemning city asserted it did not have to pay severance damages because "it probably would have conditioned development of defendants' property on 'dedication' of the [take]." (*Hollister, supra,* at p. 297, fn. omitted.) Citing *Lone Tree*, the court stated: "Where there is a reasonable probability that development of the property would have been conditioned on dedication of the property taken, compensation to the owner for the harm caused by the taking cannot be based on the property's development potential." (*Hollister, supra,* at p. 297.)

12

*Hollister* then connected the reasonable probability test to the requirement that the proposed dedication withstand constitutional scrutiny: "[P]roof that a conditional dedication is a 'reasonable probability' requires a showing not only that plaintiff would probably have imposed the dedication condition if defendants had sought to develop the property, *but also* that the proposed dedication requirement would have been constitutionally permissible. This is so because it is not a 'reasonable probability' that a governmental entity would actually succeed in imposing an unconstitutional dedication requirement." (*Hollister, supra,* 26 Cal.App.4th at p. 297.) The court continued: "A conditional dedication is invalid if it deprives the owner of the property of constitutional protections. [Citation.] A requirement of a conditional dedication of property for street purposes does not offend the Constitution if 'it is a condition reasonably related to increased traffic and other needs *of the proposed subdivision* . . . .' [Citation.] However, '[w]here the conditions imposed are not reasonably related to the landowner's proposed use, but are imposed by a public entity to shift the burden of providing the cost of a public benefit to one not responsible, or only remotely or speculatively benefiting from it, there is an unreasonable exercise of police power.' [Citation.]" (*Id.* at p. 298; see also *Rohn v. City of Visalia* (1989) 214 Cal.App.3d 1463, 1470, 1475-1476 [street dedication requirement imposed as condition of approving development of larger parcel held invalid because it was not reasonably related to the traffic and other impacts the larger parcel would have upon its development].)

13

C. *The Essential Nexus and Rough Proportionality Tests*

In 1987, before the decisions in *Lone Tree*, *Hollister*, and *Rohn* were issued, the United States Supreme Court held that a development condition violates the Fifth Amendment takings clause unless there is an "essential nexus" between the nature of the condition and the governmental interest to be served by its imposition. (*Nollan v. California Coastal Com'n* (1987) 483 U.S. 825, 839 [easement allowing public access across private beach to connect two public beaches lacked essential nexus to stated government interest in reducing blockage of public view of ocean].) Then in 1994, the high court addressed the issue left open in *Nollan*: "If we find that a nexus exists, we must then decide the required degree of connection between the exactions and the projected impact of the proposed development." (*Dolan, supra,* 512 U.S. at p. 386.)

The property owner in *Dolan* applied to the city for a permit to replace an existing building that housed her plumbing and electrical supply store. She also sought to expand her store parking lot. The owner's application was approved, conditioned upon her dedicating a portion of her property for a public greenway to improve storm drainage and another strip of property, adjacent to the greenway, for a pedestrian and bicycle pathway. (*Dolan, supra,* 512 U.S. at pp. 379-380.) In approving the application subject to the dedication condition, the city planning commission made generalized findings concerning the relationship between the permit conditions and the project's impacts. (*Id*. at pp. 381-382.) The owner challenged the permit conditions on constitutional grounds. (*Id*. at p. 386.)

14

The *Dolan* court stated: "In evaluating petitioner's claim, we must first determine whether the 'essential nexus' exists between the 'legitimate state interest' and the permit condition exacted by the city. [Citation.] If we find that a nexus exists, we must then decide the required degree of connection between the exactions and the projected impact of the proposed development." (*Dolan, supra,* 512 U.S. at p. 386.) For purposes of the takings clause, the court explained there must be "rough proportionality" between the nature and extent of the required exaction and the impacts of the proposed development. (*Id*. at p. 391.) The city has the burden of establishing this rough proportionality. (*Id*. at p. 391 & fn. 8.) To meet this burden, "[n]o precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." (*Id*. at p. 391, fn. omitted.)[4]

The *Dolan* court found there was a nexus between the city's permit conditions and the governmental interests to be served by the conditions. (*Dolan, supra,* 512 U.S. at pp. 387-388.) Still, the city made an insufficient showing of the extent or degree of the connection between the city's exactions and the impacts caused by the proposed development. (*Id*. at pp. 394-395.) Regarding the greenway dedication, the court noted

---

[4] In *Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, the California Supreme Court applied the *Dolan* "rough proportionality" analysis to development permits that exacted a fee as a condition of approval. The court stated that there must be "'some sort of *individualized* determination that the required dedication is related both in nature and extent to the impact of the proposed development.' [Citation.]" (*Ehrlich v. City of Culver City, supra,* at p. 880.)

the "city has never said why a public greenway, as opposed to a private one, was required in the interest of flood control." (*Id*. at p. 393.)  Regarding the pedestrian/bicycle pathway, the court acknowledged that "[d]edications for streets, sidewalks, and other public ways are generally reasonable exactions to avoid excessive congestion from a proposed property use," but concluded, "the city has not met its burden of demonstrating that the additional number of vehicle and bicycle trips generated by petitioner's development reasonably relate to the city's requirement for a dedication of the pedestrian/bicycle pathway easement.  The city simply found that the creation of the pathway 'could offset some of the traffic demand . . . and lessen the increase in traffic congestion.'" (*Id*. at p. 395, fn. omitted.)  This "'is a far cry from a finding that the bicycle pathway system *will*, or is *likely to*, offset some of the traffic demand.'" (*Ibid*.)[5]

D.  *The Application of Dolan in State Route 4*

In *State Route 4 Bypass Authority v. Superior Court* (2007) 153 Cal.App.4th 1546 (*State Route 4*), a condemnation action, the court applied *Dolan* and concluded that two claimed dedication requirements satisfied its rough proportionality test.  (*State Route 4, supra,* at pp. 1559-1561.)  A joint powers agency consisting of Contra Costa County and the Cities of Antioch and Brentwood (the Bypass Authority) sought to construct a new

---

[5]  In *Koontz v. St. Johns River Water Mgmt. Dist.* (2013) ___ U.S. ___ [133 S.Ct. 2586, 186 L.Ed.2d 697] the high court recently held that the rough proportionality test of *Dolan*, also known as the "unconstitutional conditions doctrine," must be satisfied when the government denies a land use permit application based on a development condition the owner is unwilling to agree to, and must also be satisfied when the condition is for money or offsite mitigation, as opposed to a property dedication.  *Koontz* has no bearing on the issues raised on this appeal.

16

roadway, State Route 4, linking a major interchange in Antioch to Marsh Creek Road in Brentwood (the Bypass Project). (*Id*. at p. 1550.) Two eminent domain actions were filed, one involving property owned by Morimoto and another involving property owned by Nunn.

Regarding the Morimoto property, the Bypass Authority sought to condemn a 250-foot-wide strip of land totaling 16.94 acres. The appraiser for the Bypass Authority determined that if the Morimotos were to develop their property the agency would require them to dedicate a 110-foot-wide strip of land totaling 4.69 acres. Based on *Porterville*, the Bypass Authority claimed the 110-foot-wide strip should be valued based on its existing agricultural use, rather than the higher, developable commercial value of the remaining 12.25 acres. (*State Route 4, supra,* 153 Cal.App.4th at p. 1551.)

The Bypass Authority also sought to condemn a 250-foot-wide strip of the Nunn property, totaling 3.31 acres, and claimed that if the Nunns sought to develop their property the City of Antioch would require them to dedicate a 110-foot strip totaling 1.49 acres. The Bypass Authority accordingly sought to acquire the 1.49 acres based on its existing agricultural use and value, and value the remaining 1.82 acres based on commercial development potential. (*State Route 4, supra,* 153 Cal.App.4th at pp. 1551-1552.)

The cases were consolidated and the parties stipulated to a bifurcated trial. (*State Route 4, supra,* 153 Cal.App.4th at pp. 1549, 1552.) The parties agreed that during an initial phase the court would determine whether there was a reasonable probability the

city would require the 250-foot strip dedications for State Route 4 in the event the owners developed their properties, and whether the required dedications would be constitutionally permissible. (*Id*. at p. 1552.)

During the bench phase, the owners presented no witnesses. (*State Route 4, supra,* 153 Cal.App.4th at p. 1552.) Among other witnesses, the Bypass Authority presented the testimony of a traffic engineer and traffic planner, Gerald Walters. Walters testified concerning "individualized nexus studies of the Nunn and Morimoto properties, comparing the traffic impacts attributable to the developments proposed for [the] properties with the cost to each property of meeting the dedication requirement and paying [development fees]." (*Id*. at p. 1553, fn. omitted.) Walters opined the Morimoto and Nunn properties would realize "other, less quantifiable benefits due to their proximity to the Bypass Project," because as developed they were expected to include retail components and their proximity to the Bypass Project would make them more visible and convenient to potential customers. (*Id*. at p. 1554.)

At the conclusion of the bench phase, the trial court ruled in favor of the owners and found the dedication requirements were not constitutionally permissible under *Dolan*. (*State Route 4, supra,* 153 Cal.App.4th at p. 1554.) The appellate court granted the Bypass Authority's writ petition and reversed. (*Id*. at pp. 1549-1550, 1568.) In reversing the trial court, the court noted: "The trial court found that there was no dispute that the City of Antioch would require dedication of a full 110-foot-wide strip straddling the centerline of the bypass alignment as a condition for the development of both the Nunn

18

and Morimoto properties.  Thus, the first prong of the *Porterville* test was met:  It was reasonably probable that if the owners had sought approval to develop their properties, the city would have conditioned such approval on the specified dedication.  The salient disputed issue . . . was whether applying such a condition to the hypothetical development of the [Nunn and Morimoto] properties would have been constitutionally permissible" under *Dolan*.  (*State Route 4, supra,* at p. 1559.)  The appellate court disagreed with the trial court and concluded that the 110-foot dedication requirements met the rough proportionality test of *Dolan*.  (*State Route 4, supra,* at pp. 1559-1561.)

## IV.  THE BIFURCATED BENCH TRIAL

### A. *The Bifurcation Motion*

Before trial, the City moved to bifurcate the proceeding and have the court determine "the legal issue of the validity of [the] dedication requirement."  Although the City acknowledged that the dedication requirement is "related to" and "affect[s] the determination of compensation," it argued that the issue "must be decided by the court before a valuation trial goes before the jury."  In particular, the City sought to have the trial court determine during the first phase whether there was a reasonable probability that the City would require the dedication of the take as a condition of development and, if so, whether this required dedication "passe[d] constitutional muster."  The City proposed that, based on these determinations, there would be a second phase of the trial where the jury would determine the amount of compensation.  The City relied, in part, on *State Route 4*.

19

The owners opposed the motion on the ground that factual questions concerning the reasonable probability of the dedication and the constitutional issues must be tried by a jury. The owners relied primarily on the California Supreme Court's decision in *Metropolitan Water Dist. of So. California v. Campus Crusade for Christ, Inc.* (2007) 41 Cal.4th 954 (*Campus Crusade*), which held that in an eminent domain proceeding, the determination of whether there is a reasonable probability of a zoning change is ordinarily a question of fact for the jury. (*Id.* at p. 967.)

In addressing the City's motion, the following discussion occurred:

"THE COURT: . . . This is a close call. And I appreciate the arguments on both sides. They are well made. I think I'm going to go ahead and bifurcate this trial as was done in the [*State Route 4*] case. . . .

"We'll have two phases. First, we'll have the *legal determination* of both the constitutionality and the reasonable probability of the dedication. And then second we'll have valuation to take before the jury.

"[OWNERS' ATTORNEY]: Your Honor, is the Court then ruling that reasonable probability of the dedication is not an issue for the jury?

"THE COURT: Yes

"[OWNERS' ATTORNEY]: The *Campus Crusade* issue?

"THE COURT: Yes, I'm tentatively ruling that. . . . I think [the City's attorney] has the better of the argument on that point . . . . [¶] . . . [¶] . . . I think . . . the best thing

20

to do would be to start the bench phase of the bifurcation of the trial on the dedication requirement. . . ."  (Italics added.)

B.  *The Bench Trial Testimony*

    1.  The City's Witnesses

City manager, Richard Belmudez, and city engineer, Habib Motlagh, testified for the City.  Belmudez testified about the City's adoption of the circulation element to the general plan in 2005 and the resolution of necessity authorizing this eminent domain action.  In 2005, the City felt the area was underdeveloped and the main reason seemed to be lack of infrastructure; the circulation element was therefore amended to accommodate the land use plan for that area.

The circulation element, he said, is supported by studies of traffic conditions.  The traffic studies are used to ensure that the planned road will be sufficient to accommodate the projected volume of traffic.  The redesign of Indian Avenue as a secondary arterial, he explained, was "designed to move large volumes of traffic" through the City and "siphon it out to the arterial freeways [and] expressways."  It would also allow for development of property in north Perris and "alleviate the traffic that was occurring as a result of recent developments."  Lowe's requested the realignment of Indian Avenue, and it was to be constructed as a condition of approval for the Ridge property development.

There was no property-by-property, or "micro level," analysis of the effect on traffic arising from the development of the specific property.  Belmudez explained that if it turned out that the amount of traffic related to the future development of the Stamper

21

Property did not justify the take, the City would be "willing to make other concessions" to the owners when it was developed. He indicated, however, that if there are development concessions with developers, they are normally placed in a development agreement. Nowhere in the resolution of necessity is there any indication that the Stamper Property will get a credit on development fees if they are paid a lesser amount in condemnation. Nowhere has the City made a written commitment as to fee reductions.

Belmudez further testified that the City's municipal code requires that property owners who desire to develop their property must dedicate to the City the portion of their property that is designated for streets in the circulation element. The City would require, as a minimum dedication, whatever is shown in the circulation element. Not only is this requirement in the City's municipal code, he added, but the City has a practice of requiring property owners to dedicate such property. In particular, he said the owners in this case would be required to dedicate the take for the construction of Indian Avenue in accordance with the circulation element.

Motlagh testified that the adoption of the circulation element in 2005 was one of the steps to encourage development in the area. The alignment of Indian Avenue is a critical element as it relates to the City of Moreno Valley's circulation plan. If the owners wanted to develop the Stamper Property, the City would require them to dedicate the area needed for Indian Avenue and to pay for their share of the cost of constructing the street. According to Motlagh, the construction of Indian Avenue would be a "great

22

benefit" to the owners of the adjacent property. The new street would bring traffic to the properties and provide access to other major corridors.

He indicated that the total acreage needed for the construction of Indian Avenue is 40 acres, including 1.6 acres from the Stamper Property. The 1.6 acres is less than 4 percent of the 40 acres needed. Based on the traffic studies, the maximum capacity for traffic trips on Indian Avenue is projected to be 18,000 cars. Anywhere from 1,800 cars per day up to a maximum of 3,500 cars per day could potentially be generated as a result of developing the Stamper Property. Thus, although the 1.6 acres taken from the Stamper Property is only 3.6 percent of the 40 acres needed for the project, the traffic potentially generated from the development of the Stamper Property would be between 8 percent and 14 percent of the total.

He further testified that after Indian Avenue is improved, the owners of the property would still be required, upon development, to provide access on the west side of the property and access from Perry Street, Barrett Avenue, or both. He reiterated the testimony of Belmudez that if a developer comes in and it turns out that the request to dedicate is not proportional to the traffic generated by the development, the City will work out other concessions.

On cross-examination, Motlagh testified that the half-widths of Perry Street and Barrett Avenue are currently 30 feet. In order to get these streets to their "ultimate width[s]" under the City's general plan, the City would need an additional nine feet along each street from the Stamper Property. According to Motlagh, the decision to realign

23

Indian Avenue across the Stamper Property was made without regard to whether the Stamper Property is ever developed. Motlagh further testified there were no documents reflecting any particularized analysis of how much traffic might be generated by the development of the Stamper Property. Nor were there any specific studies or analyses conducted regarding the relationship between the dedication requirement for the take and any future development of the Stamper Property. To the best of his knowledge, there are no writings that the owners would get any future credit for any amount they are undercompensated.

2. The Owners' Witnesses

Tom Merrell and Michael Waldron testified for the owners. Merrell testified on issues concerning the nature of the Indian Avenue project, the probability the City would require the dedication of the take upon development of the Stamper Property, the connection between development of the Stamper Property and the Indian Avenue project, and the degree to which the dedication of the take was proportional to the impacts of developing the Stamper Property. Merrell explained that the primary source of the truck traffic necessitating the realignment of Indian Avenue is the "very huge warehouse distribution and manufacturing facilities south of Ramona," among other places. A claim of dedication must relate to the impacts of the specific property. What is really at issue is the relationship between the impacts of the Stamper Property and the proposed dedication. The City's dedication requirement against the Stamper Property, he said, was "clearly the product of this project to realign Indian Avenue and construct it at this time."

24

He added that "[t]here's absolutely no development on the Stamper [P]roperty that could possibly trigger a need for it."

According to Merrell, the decision to require dedication as an exaction is a discretionary decision of the City. It is not reasonably probable that the City would impose the dedication requirement for Indian Avenue especially on top of all the other dedications. The property already has roughly 600 feet of existing street frontage along Perry Street and Barrett Avenue. The owners would not be expected to object to the "more normal" nine-foot-wide dedication of property fronting these streets. The owners would object to exaction of the property demanded in this case. This is not, he said, a "business as usual kind of exaction."

Merrell further opined that there is no connection between the designation of Indian Avenue as a truck route and any potential development of the Stamper Property. Regarding the proportionality of the dedication requirement, Merrell testified that while developing the Stamper Property could be expected to generate an increase in traffic so as to justify the "normal expectation" of having to dedicate the nine feet of frontage road along Perry Street and Barrett Avenue, no "development on this little nine-acre parcel could possibly . . . generate enough traffic to require" the dedication of the Indian Avenue take. Indian Avenue is a secondary arterial and is designed to handle 20,000 to 25,000 trips per day. Barrett Avenue and Perry Street are designed to handle half that traffic and, based on general rules of thumb, it appears that the Stamper Property would generate a tenth of the traffic that Indian Avenue is designed to carry.

25

Waldron was the owners' valuation expert. He testified that in the marketplace, buyers and sellers consider dedications in the purchase and sale of the property.

The subject property is 9.1 gross acres. The zoning is light industrial. Along the east side is Barrett Avenue, which is a 60-foot street, and along the other side is Perry Street, which is a 60-foot street. Along both streets a half-width has been dedicated. Additional footage will be required for dedication from the Stamper Property which would be nine feet of the half-width, bringing both Barrett Avenue and Perry Street to 39 feet, which would then bring the ultimate width to 78 feet based on the land use plan. If the City were to take the dedications shown for Barrett Avenue and Perry Street, each having a length of around 660 feet, the City would be taking approximately 11.3 percent of that gross area. If the City took the existing dedications along Barrett Avenue and Perry Street, and the additional dedication of the proposed realignment of Indian Avenue, it would be taking one-third of the property in terms of its dedication; this is extraordinarily onerous.

His understanding of exactions and dedications in terms of what is reasonably probable, is that they must bear some relationship to the proposed development on a local site-specific basis and not a regional basis. The dedication requirement of Indian Avenue is not reasonably probable. Indian Avenue is designed to create something that would support traffic far in excess of what the subject property's highest and best use would be.

C. *The Trial Court's Rulings*

Following the two and one-half day bench trial, the court issued a statement of decision concluding it was "reasonably probable that the right-of-way dedication across defendants' property [the 1.66-acre area of the take] would be imposed as an exaction [or dedication] when defendants bring in a development proposal for their [property]," and that the dedication requirement was constitutional. The court also ruled that section 1263.330 did not prohibit the jury from considering the dedication requirement in determining the value of the take. The court accordingly ruled that any valuation evidence submitted during the valuation phase before a jury had to be "based on the existing use of the subject property in its undeveloped state" and that "agricultural sales prices" rather than industrial-value prices, were "the proper basis for valuation of the [take]."

As noted, the owners stipulated to the entry of judgment based on the City's appraised agricultural value of the take at $44,000, and preserved their right to appeal in lieu of proceeding to the jury trial on the agricultural value of the take and their claim for severance damages. The court entered judgment condemning the take and ordering title to pass to the City upon its payment of the $44,000 sum.

## V. ANALYSIS

A. *The Right to a Jury Trial on Factual Issues Bearing on Compensation*

The state Constitution provides that "just compensation" in an eminent domain action is be "ascertained by a jury unless waived." (Cal. Const., art. I, § 19(a); *People v.*

27

*Ricciardi* (1943) 23 Cal.2d 390, 402 [issues of fact in condemnation proceedings are to be tried to the court "except [those] relating to compensation"].)  Just compensation is defined as the fair market value of the property.  (§ 1263.310.)  The fair market value is the highest price a willing seller and a willing buyer would agree upon, "each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available."  (§ 1263.320.)

In determining just compensation, "'[t]he jury is entitled to and should consider those factors which a buyer would take into consideration in arriving at a fair market value, were [the buyer] contemplating a purchase of the property.'  [Citation.]"  (*Campus Crusade, supra,* 41 Cal.4th at p. 972.)  Because "those factors" include the reasonable probability the property will undergo a zoning or other change in use, whether there is a reasonable probability the property will undergo a change in use is ordinarily a question of fact for the jury.  (*Id*. at p. 967, citing *Redevelopment Agency v. Contra Costa Theatre, Inc.* (1982) 135 Cal.App.3d 73, 84 & *People ex rel. Dept. Pub. Wks. v. Arthofer, supra,* 245 Cal.App.2d at p. 467; see also *City of Los Angeles v. Decker, supra,* 18 Cal.3d at p. 872 ["the purported need for airport parking and the suitability of defendant's property for that purpose were critical to the issue of valuation"].)

Relying primarily on *Campus Crusade*, the owners claim they had a right to a jury trial on certain factual issues bearing on the fair market value of the take, and that the trial court usurped the jury's function in ruling on these questions.  The questions include whether it is reasonably probable the City would require the take to be dedicated as a

28

condition of developing the Stamper Property, and whether the extent of the take is roughly proportionate to the Stamper Property's impacts on traffic in the event the Stamper Property is developed for light industrial uses. We agree the owners had a right to a jury trial on these questions.

In *Campus Crusade*, the Metropolitan Water District of Southern California (MWD) sought to condemn property owned by Campus Crusade for Christ, Inc. to construct a water pipeline. (*Campus Crusade, supra,* 41 Cal.4th at p. 961.) The property was zoned low-density residential to resource conservation, and allowed only low-density residential developments. (*Id.* at p. 966.) Before trial, the MWD moved to preclude the owner from presenting evidence to the jury that it was reasonably probable the property would be upzoned in the near future to allow for other uses, including a comprehensive development for residential, commercial, industrial, and recreational uses. (*Id.* at pp. 966-967.) The trial court granted the motion and found, following a pretrial hearing outside the presence of the jury, that it was not reasonably probable the proffered zoning change would occur "in the reasonably near future." (*Id.* at p. 967.)

As indicated by the Supreme Court: "[The trial court] agreed with MWD that the question whether a reasonable probability of rezoning existed in the near future was for the court to decide, and [the court] determined, based on the evidence presented by both sides at the pretrial hearing, that 'it is not reasonably probable that the subject property would be rezoned in the reasonably near future.' As a result, [the trial court] prohibited Campus Crusade's appraisers 'from valuing the remainder as anything other than

29

Resource Conservation.'" (*Campus Crusade, supra,* 41 Cal.4th at p. 967.) The Supreme Court concluded: "Unfortunately, the trial court thereby usurped the role of the jury in valuing the property." (*Ibid.*)

The Supreme Court explained: "'Where due to zoning restrictions the condemned property is not presently available for use to which it is otherwise geographically and economically adaptable, the condemnee is entitled to show a reasonable probability of a zoning change in the near future and thus to establish such use as the highest and best use of the property.' [Citation.] The jury's role in this assessment is settled. '"[T]he determination as to whether or not there is a reasonable probability of a [use] change is ordinarily a question of fact for the jury."' [Citations.]" (*Campus Crusade, supra,* 41 Cal.4th at p. 967; *City of San Diego v. Rancho Penasquitos Partnership* (2003) 105 Cal.App.4th 1013, 1041 (*Rancho Penasquitos*) ["it was a question of fact for the jury . . . whether or not the other upzonings would have occurred even without the SR-56 project"].)

Just as the question whether there is a reasonable probability a property will undergo a zoning or other change in permitted use in the near future is a question of fact bearing on the value of the property, the question whether there is a reasonable probability a planning authority will require a property to be dedicated as a development condition is a question of fact a buyer and seller will logically take into account in determining the fair market value of the property to be dedicated. (See *Hollister, supra,* 26 Cal.App.4th at p. 297 ["Where there is a reasonable probability that development of

30

the property would have been conditioned on dedication of the property taken, compensation to the owner for the harm caused by the taking cannot be based on the property's development potential."].)

Thus, whether there is a reasonable probability a planning authority would require a take to be dedicated as a development condition is ordinarily a question of fact for a jury to determine and consider in determining the fair market value of the take. (Cal. Const., art. I, § 19(a); see generally *City of Monterey v. Del Monte Dunes* (1999) 526 U.S. 687, 721-722 [whether owner has been deprived of all economically viable use of his property is predominantly a question of fact for the jury to determine].) As a general matter, the reasonable probability that a planning authority will attempt to impose a dedication condition is not an "evidentiary or other legal issue affecting the determination of compensation" for the court to determine before a jury determines the fair market value of the take. (§ 1260.040.)

In the bench trial, the City claimed it was reasonably probable—in fact it was a certainty—that it would require the entire 1.66-acre area of the take to be dedicated as a condition of developing the Stamper Property. The City relied on the June 2005 circulation element of its general plan, its municipal code, its policies and practices, and the testimony of Belmudez, its city manager, that the City has a practice of requiring the dedication of all properties designated for streets in its circulation element as development conditions. Based on this evidence, which the owners did not dispute, the

31

trial court found there was a reasonable probability the City would require the take to be dedicated as a Stamper Property development condition.

On remand, a jury can determine whether there is a reasonable probability the City would require the take to be dedicated as a Stamper Property development condition, unless the court finds the evidence is insufficient to allow reasonable jurors to conclude the City would *not* require dedication of the take as a development condition. In *Campus Crusade,* the court clarified that the sole role of the trial court on factual issues affecting compensation is to act as an evidentiary gatekeeper. (*Campus Crusade, supra,* 41 Cal.4th at p. 968 [trial court must initially determine there is sufficient evidence to allow a jury to find a zoning change is reasonably probable in the near future before the issue may go to the jury].) Thus here, the court must initially determine whether reasonable jurors could conclude it is not reasonably probable the City would attempt to impose the dedication condition as a development condition. Only if there is insufficient evidence to allow the question to go to the jury may the court withhold the question from the jury and determine it as an "evidentiary or other legal issue affecting the determination of compensation." (§ 1260.040.)

In addition, if the court finds there is sufficient evidence to allow the reasonable probability question to go to the jury, it should instruct the jury not to confuse the reasonable probability question with the separate distinct question of whether the dedication condition may be constitutionally imposed, that is, whether the nature and extent of the dedication condition is roughly proportionate to the traffic and other impacts

32

the Stamper Property would have if developed as light industrial property. (*Dolan, supra,* 512 U.S. at p. 391.) The court in *Hollister* observed that: "[P]roof that a conditional dedication is a 'reasonable probability' requires a showing not only that plaintiff would probably have imposed the dedication condition . . . *but also* that the proposed dedication requirement would have been constitutionally permissible. This is so because it is not a 'reasonable probability' that a governmental entity would actually succeed in imposing an unconstitutional dedication requirement." (*Hollister, supra,* 26 Cal.App.4th at p. 297.)

We agree that a governmental entity will not "actually succeed" in imposing a constitutionally impermissible dedication condition. But whether there is a reasonable probability a planning authority will *assert or attempt to impose* a dedication condition is a separate and initial question of fact that must be determined before the jury determines whether the condition may be constitutionally imposed. If it is not reasonably probable a planning authority will assert or seek to impose a dedication condition in the first instance, there is no need to determine whether it could be constitutionally imposed.

When the constitutionality of a dedication condition is challenged, as it is here, whether and to what extent it can be constitutionally imposed involves additional factual questions for a jury to determine. As discussed, a dedication condition cannot be constitutionally imposed unless it is roughly proportionate in both nature and extent to the impacts of the developed property. (*Dolan, supra,* 512 U.S. at p. 391.) Determining the nature and extent of a dedication condition and their relationship or proportionality to

33

the nature and extent of the traffic and other impacts of a property development are factual determinations.

During the bench trial, the City claimed the entire 1.66-acre area of the take, or the 94-foot-wide swath to be taken roughly from the middle of the Stamper Property, was roughly proportionate to the traffic impacts the Stamper Property was reasonably expected to generate if and when it is developed for light industrial uses. The city engineer estimated the Stamper Property as developed would generate between 8 and 14 percent of the 18,000 daily vehicle-trip capacity of Indian Avenue, but admitted no studies had been conducted to support this claim. The owners claimed the traffic impact figure was closer to 10 percent of Indian Avenue's capacity, but they also claimed the Stamper Property had no need for Indian Avenue or a "third street" when developed because it already had 1,260 feet of street frontage on Barrett Avenue and Perry Street. The owners also claimed the previous 30-foot dedications and the anticipated additional nine-foot dedications for Perry Street and Barrett Avenue were roughly proportionate to the Stamper Property's anticipated traffic impacts.

On remand, a jury must be allowed to determine whether, and if so to what extent, the 1.66-acre area of the take, or the 94-foot-wide swath through the Stamper Property, is roughly proportionate to the Stamper Property's anticipated impacts on area traffic if and when the Stamper Property is developed. Based on the evidence presented during the bench trial, reasonable jurors could differ on whether all or any part of the 1.66-acre take could be constitutionally imposed as a dedication condition on development. If on

34

remand the jury determines that part, but not all, of the 1.66-acre area of the take could be constitutionally imposed as a dedication condition, it must value *that* part of the take based on its current use and the remaining portion on its highest and best use. If the jury determines that no part of the take could be constitutionally imposed as a dedication condition, it must value the entire take based on its highest and best use, which is apparently as industrial property.

A similar two-part valuation of condemned property occurred in *State Route 4*. The Bypass Authority sought to acquire 250-feet-wide strips of land from two properties, but agreed it could constitutionally require the dedication of only 110 of the 250 feet it sought to condemn. (*State Route 4, supra,* 153 Cal.App.4th at p. 1551.) The Bypass Authority's appraisals were based on valuing 110 feet at its current use as agricultural land and the remaining portion on its highest and best use for development purposes. (*Id*. at pp. 1551-1552.) Unlike the parties here, the parties in *State Route 4* agreed to allow the trial court to determine whether it was reasonably probable the 110-foot claimed dedication condition could be lawfully imposed. (*Id*. at p. 1552.)

Because the trial court erroneously "usurped the role of the jury" in determining factual issues bearing on the value of the take without considering whether there was sufficient evidence to allow the questions to go to the jury (*Campus Crusade, supra,* 41 Cal.4th at p. 967-968; § 1260.040), the judgment must be reversed and the matter

remanded for a jury trial on the reasonable probability and rough proportionality

questions.**6**

B. *Rough Proportionality Cannot be Based on Unenforceable Promises of Future*

*Benefits or Development Concessions to the Property Owner*

In a condemnation proceeding, the jury or trier of fact "must '. . . once and for all

fix the damages, present and prospective, that will accrue reasonably from the

construction of the improvement'" or condemnation. (*County of San Diego v. Bressi*

(1986) 184 Cal.App.3d 112, 123; see also §§ 1263.120-1263.150 [condemned property in

condemnation proceedings is valued upon commencement of trial or retrial].) That is, the

fair market value of the condemned property, together with severance damages and all

other reasonably foreseeable damages resulting from the condemnation, must once and

for all be fixed in the condemnation proceeding. (*Albers v. County of Los Angeles* (1965)

62 Cal.2d 250, 265 [doctrine of estoppel by judgment or deed precludes condemned

---

**6** An authority on California condemnation practice states: "Obviously, the court must decide the constitutional correctness of any alleged dedication requirement." (1 Matteoni & Veit, Condemnation Practice in Cal., *supra,* § 9.48, p. 583.) The statement is unsupported by citation to authority and potentially misleading. A court may determine the constitutionality or rough proportionality of a dedication requirement based on undisputed facts or when, as in *State Route 4*, the parties agree to allow the court to determine the question. (*State Route 4, supra,* 153 Cal.App.4th at p. 1552.) An appellate court may also be called upon to determine the constitutional validity or rough proportionality of a dedication requirement based on undisputed facts or substantial evidence. (See *id*. at p. 1560.) But in an eminent domain proceeding, a property owner has a right to have a jury determine whether a claimed dedication condition is roughly proportionate to the impacts of the developed property because the determination is essentially a factual question bearing on the value of the property taken. (Cal. Const., art. I, § 19(a).)

property owner from later claiming damages reasonably foreseeable at time of the condemnation judgment or deed]; see 2 Matteoni & Veit, Condemnation Practice in Cal., *supra*, § 16.5, pp. 980-981.)

As discussed, the constitutionality of a dedication condition depends on whether it is roughly proportionate in both nature and extent to the impacts of the developed property. (*Dolan, supra,* 512 U.S. at p. 391 ["No precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related in both nature and extent to the impact of the proposed development"].) And in eminent domain proceedings, the value of the property must be based on its fair market value or highest and best use unless it is subject to a constitutionally permissible dedication condition, in which case it must be valued based on its current use. (*Hollister, supra,* 26 Cal.App.4th at p. 297.)

In *State Route 4*, the court concluded substantial evidence showed that the 110-foot dedication conditions met the rough proportionality test of *Dolan*. (*State Route 4, supra,* 153 Cal.App.4th at pp. 1559-1560.) While recognizing the *Dolan* test had to be applied, as it does here, "to the purely hypothetical circumstance of a possible future development application," the court noted the "responsible officials" made "individualized determinations" of the Nunn and Morimoto properties' potential impacts on traffic, and on the basis of those determinations reasonably concluded that the 110-foot dedication conditions were not excessively burdensome or disproportionate in relation to the Nunn and Morimoto properties' potential traffic impacts. (*State Route 4,*

37

*supra,* 153 Cal.App.4th at pp. 1559-1560.) The court reasoned that the evidence showed "the responsible officials were confident that the economic burden of complying with the dedication requirement was modest in relation to the cost of accommodating the likely traffic impact of any 'significant development' to which it might apply." (*Id*. at p. 1560.) The court also pointed out "there was no evidence that the Bypass Authority or the City of Antioch, if faced with a proposed development that would generate only an insubstantial amount of additional traffic, would have insisted on imposing the dedication policy *without negotiation, modification, or offset*." (*Ibid.,* italics added.)

In concluding that the 1.66-acre area of the take was roughly proportionate to the Stamper Property's potential traffic impacts, the trial court reasoned that: "[A]s far as we can tell, the dedication . . . is roughly proportional to the impacts of future development of the [Stamper P]roperty. It is too early for the sort of individualized determination that the court could make in [*Dolan*], but the exaction is not too excessive to meet the legal standards for hypothetical developments under [*State Route 4*]. If it turns out that the development project the defendants actually submit generates less traffic than the 2005 Circulation Element and the Municipal Code contemplate, the City can negotiate concessions with a development agreement or otherwise to assure that what appears today to be at least rough proportionality is maintained through buildout so that another *Dolan* case is avoided. On the stand the City Engineer [Motlagh] testified that such negotiation was City practice, and no evidence was offered to the contrary."

38

We respectfully disagree with *State Route 4* to the extent it holds that the rough proportionality test may be determined based on a condemning or planning authority's unenforceable promises of future development concessions to the property owner in the event it turns out the extent of the developed property's impacts are less than anticipated at the time of trial in the eminent domain proceeding. Specifically, we do not believe the rough proportionality test may be met based on promises of future "negotiation, modification, or offset." (*State Route 4, supra,* 153 Cal.App.4th at p. 1560.)

Though it is difficult to gauge the nature and extent of a hypothetical development project's impacts when no specific development proposal has been made (see *State Route 4, supra,* 153 Cal.App.4th at p. 1559), the impacts must nonetheless be reasonably determined in the condemnation proceeding, and the trier of fact must determine whether those impacts are roughly proportionate to the hypothetical dedication condition. Deferring the rough proportionality calculation based on nonspecific and unenforceable promises of future development concessions risks depriving the owner of his right to just compensation for the fair market value of the property taken in the condemnation proceeding.

C. *Section 1263.330 Does Not Require Evidence of the Claimed Dedication Condition to be Excluded in Determining the Fair Market Value of the Take*

Section 1263.330 provides: "The fair market value of the property taken shall not include any increase or decrease in the value of the property that is attributable to any of the following: [¶] (a) The project for which the property is taken. [¶] (b) The eminent

39

domain proceeding in which the property is taken. [¶] (c) Any preliminary actions of the plaintiff relating to the taking of the property."[7]

Here, there is no dispute that the project for which the property is taken is Indian Avenue. The owners argue that the dedication of the property for the Indian Avenue project would not have been required in the absence of the project; therefore, the dedication is attributable to the project. In that the dedication requirement is a value decreasing exaction (the City pays for the property at its underlying agricultural value as opposed to light industrial value), it cannot be considered in determining the fair market value of the property taken. We disagree that the statute applies in this manner.

While certainly there would be no requirement of a dedication of property for Indian Avenue, if the Indian Avenue project did not exist, the imposition of a dedication is nonetheless not attributable to the project within the confines of the statute. As has been previously discussed, dedication requirements exist independent of any specific project. (See Gov. Code, § 7050 ["dedication of real property for any public purpose, including, but not limited to, streets, highways . . . ."].) The requirement of dedicating private property for public purposes has long been accepted as a proper exercise of a

---

[7] A similar rule is in Government Code section 7267.2, which governs the making of an offer to purchase property prior to initiating eminent domain proceedings. Subdivision (a)(1) of that section provides that the offer shall be based on the fair market value of the property, provided that "[a] decrease or increase in the fair market value . . . caused by the public improvement for which the property is acquired, or by the likelihood that the property would be acquired for the improvement, other than that due to physical deterioration within the reasonable control of the owner or occupant, shall be disregarded . . . ." (See also 42 U.S.C.A. § 4651(3).)

governmental power. Here, the decrease in value as argued by the owners is not attributable to the project, it is attributable to a free-standing dedication requirement.

In our view, the statute's application is very straightforward. If, for example, we assume the same facts as presented here, the statute would apply in the following manner: Before the Indian Avenue project the property had a value of $10 per square foot. As a result of the project, the land's overall value is $20 per square foot. Under the statute, the owners would not be able to recover $20 per square foot for the take, because the increase in value is attributable to the project. Likewise, if before the project the land was valued at $10 per square foot, and as a result of the project the land is valued at $5 per square foot, the City would be precluded from arguing that it should pay the decreased value of $5 per square foot. It is within the above context that the statute and any jury instructions based thereon may be relevant to this matter.

To support the application of section 1263.330, the owners rely on *Rancho Penasquitos, supra,* 105 Cal.App.4th 1013 and *City of San Diego v. Barratt American, Inc.* (2005) 128 Cal.App.4th 917 (*Barratt*). Both cases are inapposite.

In *Rancho Penasquitos,* the trial court precluded the city from introducing into evidence at the valuation phase of the trial a value based on the properties' then agricultural use. In affirming the trial court, Division 1 of this court held that the properties' then agricultural use was attributable to the project, and therefore inadmissible under section 1263.330.

41

The facts pertinent to the court's decision are as follows: In 1959, the California Legislature established proposed State Route 56 (SR-56). It was to provide a regional link between Interstates 5 and 15. The proposed state route became part of the City of San Diego's circulation element in 1965. (*Rancho Penasquitos, supra,* 105 Cal.App.4th at p. 1020.) At some point thereafter, the city created the North City Future Urbanizing Area (NCFUA). It consisted of 12,000 acres and was "created '"to avoid premature urbanization, to conserve open space and natural environmental features and to protect the resources of the City by precluding costly sprawl and/or leapfrog urban development."' Zoning within the NCFUA was designated as A-1-10 agricultural, allowing one dwelling per every 10 acres . . . ." (*Id.* at p. 1019.) As part of the planning for the future development, the city established subareas, two of which restricted development because the proposed SR-56 corridor would cross somewhere through these subareas. Defendants owned property within these subareas.

"According to the City, the purpose of the zoning restriction was to prevent development of land that might conflict with the final alignment of SR-56. However, the ban on development did not apply to properties not within the proposed path of SR-56 and such properties could be upzoned upon application." (*Rancho Penasquitos, supra,* 105 Cal.App.4th at pp. 1020-1021.) In that the exact location of SR-56 had not been determined, the NCFUA provided, as to the two subareas through which the road was to be constructed: "'Subareas III and IV: The City will undertake an alignment study for SR-56. Subarea Plans for these areas may be approved, provided sufficient corridors are

42

designated for alternative alignments for SR-56. *However, discretionary approval for development in these subareas shall not be approved prior to the adoption of the City's final alignment for SR-56.'* . . . [¶] . . . [¶] 'Final selection of the alignment for SR-56 must occur *prior to discretionary approval of any development in the Torrey Highlands community which is affected by the final alignment.'* . . ." (*Id.* at p. 1020.) At some point thereafter, the final alignment of SR-56 was decided upon. In that the alignment went through the defendants' property, the city filed an eminent domain action seeking to condemn 10.94 acres.

At trial, "[t]he City asserted . . . that because it had a zoning restriction in place prohibiting higher density development of properties . . . that were in the potential path of SR-56 until the SR-56 project was approved, a zoning change was not possible absent the SR-56 project, and therefore the property must be valued at its current zoning for agricultural use." (*Rancho Penasquitos, supra,* 105 Cal.App.4th at pp. 1017-1018.) The owners contended that because the city was the condemning agency and the entity responsible for the "prohibition of development" and that the prohibition was designed to lower the city's cost of acquisition, the property must be valued based on an amount that did not consider the city's prohibition on zoning changes. The trial and appellate courts agreed with the owners.

As stated by the appellate court: "We conclude that the [trial] court correctly excluded from evidence the City's zoning restriction precluding upzoning of [the owner's] property absent approval of the SR-56 project because (1) the zoning and

43

condemning agencies are the same and (2) the restriction discriminates against [the owner's] property in order to depress its value for a future taking by eminent domain." (*Rancho Penasquitos, supra,* 105 Cal.App.4th at p. 1019.) The city "cannot impose a zoning restriction forbidding upzoning in order to preserve land for the [freeway] project, thereby depressing or freezing the land's value, and thereafter rely upon that project-related restriction to set a value on the project. It is undisputed that the sole reason for the restriction was the [freeway] project. It is clear that the zoning restrictions excluded by the [trial] court were to be used by the City to show a 'decrease in the value of the property that is attributable to . . . [¶] . . . [t]he project for which the property is taken' or 'preliminary actions of the plaintiff relating to the taking of the property.' (§ 1263.330, subds. (a) & (c).)" (*Id.* at p. 1038.) Because the trial court was required to "'disregard the effect of steps taken by the condemning authority toward that acquisition,'" the City of San Diego could not use the zoning restriction to establish the value of the property. (*Id.* at p. 1039, italics omitted.) It cannot "'purport to exercise a police power by enacting a zoning ordinance which in reality discriminates against a group of parcels of land, in order to freeze their value with a view to future takings in eminent domain.'" (*Id.* at p. 1024.)

In *Rancho Penasquitos,* the court was clearly faced with a unique situation. Because of the proposed SR-56 project, the city had, in essence, placed a moratorium on development throughout subareas III and IV. The A-1-10 agricultural zoning was specifically put into place to freeze property values because of the SR-56 project. The

44

artificial decrease in value was solely attributable to the project. This differs from the present case, wherein the City is using a free-standing dedication requirement which is applied across the board to all development within the community. The requirement for dedication was not a governmental action designed to be applied solely to the Indian Avenue project.

*Barratt, supra,* 128 Cal.App.4th 917 involved the same freeway project that spawned the *Rancho Penasquitos* case. In *Barratt*, both parties were prepared to offer expert testimony valuing the property without considering the impact on value attributable to the project as required by section 1263.330; the issue "was *how* the appraisers and the jury were to disregard project-caused increases or decreases in the value of the taken property." (*Barratt, supra,* at pp. 927, 937.)

Each side based its appraisal on a different fictional assumption. The defendant owners' method for valuing the taken property—the "no Project construct"—"was founded on the fiction that the Project had never been conceived or planned." (*Barratt, supra,* 128 Cal.App.4th at p. 928.) The City of San Diego's method—the "abandoned Project construct"—"was founded on the fiction that the Project was abruptly abandoned on the . . . valuation date." (*Ibid.*) The trial court granted the owners' motion in limine to preclude the city's experts from valuing the taken property based on the abandoned Project construct. (*Id.* at p. 929.) At trial, the experts for both sides based their valuation on the assumption that the project had never been planned. (*Id.* at pp. 930-931.)

The Court of Appeal held that the trial court correctly barred the city's experts from relying on the abandoned project construct. (*Barratt, supra,* 128 Cal.App.4th at pp. 938-939.) The *Barratt* court confirmed the rule that "developmental constraints 'predicated on [the] very project' for which the land was condemned were irrelevant to the valuation of the taken property." (*Id.* at p. 938.) The problem with the city's abandoned project construct was that while it assumed no "de jure restrictions" on development as of the date of valuation, it assumed certain "de facto restrictions"; namely, that the sudden cancellation of the project would result in a moratorium on development until a new traffic plan was developed. (*Id.* at pp. 928, 938.) Such restrictions, the court held, "did *not* disregard the impact of the Project on the value of the taken property." (*Id.* at p. 937.) The court rejected the city's argument that the owners' "no Project construct" was based on "an imagined planning process," and therefore speculative. (*Id.* at p. 939.) Again, as in *Rancho Penasquitos*, the underpinning of the abandoned project construct was attributed to the A-1-10 agricultural zoning which was specifically put into place to freeze property development and values specifically because of the SR-56 project.

## VI. DISCUSSION/EVIDENTIARY ISSUES AND DEPOSIT

A. *The Valuation-related Testimonies of Belmudez and Motlagh*

The owners claim the trial court erroneously allowed the city manager (Belmudez) and city engineer (Motlagh) to give expert opinion testimony even though the City did not designate them as expert witnesses. (§ 1258.210 et seq.) We agree.

46

Both witnesses testified there was a reasonable probability the claimed dedication condition would be imposed; there was an essential nexus between the dedication condition (for traffic improvements) and the developed Stamper Property's impacts on traffic. Each witness additionally offered testimony as to the issue of the rough proportionality of the dedication requirement to the impacts caused by a developed Stamper Property. While the basis for their opinions may have been gained through their employment with the City, their testimony is nonetheless expert in nature. Each witness necessarily relied on municipal development standards and principles of traffic engineering in coming to their respective conclusions. Both areas are beyond lay knowledge.

As set forth in the California Law Revision Commission Comments, 19 West's Annotated Code of Civil Procedure (2007 ed.) following section 1258.240, page 604 (List of witnesses; contents): "Section 1258.240 is the same as former Section 1272.03. It requires inclusion of all persons to be called as experts, not merely those to be called as valuation experts."

While we are aware that the discovery act does not apply to eminent domain actions (see § 2034.010), each side will have the opportunity to appropriately list their respective experts upon retrial (cf. *Fairmont Ins. Co. v. Superior Court* (2000) 22 Cal.4th 245).

47

B. *The Postjudgment Order Regarding the Deposit is Reversed*

Before trial, the City deposited $511,602 as the probable amount of compensation payable to the owners. (§ 1255.010.) After trial, the court issued a postjudgment order allowing the City to withdraw the deposit to the extent it exceeded the $44,000 judgment. (§ 1255.030, subd. (e) ["If the court determines that the amount deposited exceeds the probable amount of compensation, it may permit the plaintiff to withdraw the excess not already withdrawn by the defendant"].)

The owners separately appeal the postjudgment order. Because the judgment is reversed and the matter remanded for a jury trial on the value of the take, the postjudgment order allowing the City to withdraw a portion of the deposit must also be reversed.

## VII. DISPOSITION

The judgment is reversed and the matter is remanded for a jury trial on the amount of compensation, including the value of the take and severance damages. The postjudgment order allowing the City to withdraw the amount it deposited in excess of $44,000 is also reversed. The owners shall recover their costs on appeal.

CERTIFIED FOR PUBLICATION

KING _____
                                                                          J.

We concur:

McKINSTER _____
              Acting P. J.

MILLER _____
                        J.

48